E-filing

1  **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2  Name   McKEAN        RONALD           P.
       (Last)          (First)         (Initial)

3  Prisoner Number ___V-22458___

4  Institutional Address  Pleasant Valley State Prison

5  P.O. Box 8501, Coalinga, CA  93210-8501

6  ==================================================

7  **UNITED STATES DISTRICT COURT**
   **NORTHERN DISTRICT OF CALIFORNIA**

8  RONALD PAUL McKEAN
   (Enter the full name of plaintiff in this action.)                     cv ) 08          2450

9                                                 )
                      vs.                          )      Case No. _____
10 JAMES A. YATES, Warden                          )      (To be provided by the clerk of court)
                                                   )
11 _____                )      **PETITION FOR A WRIT**
                                                   )      **OF HABEAS CORPUS**
12 _____                )
                                                   )
13 _____                )
                                                   )
14 (Enter the full name of respondent(s) or jailor in this action)  )
                                                   )
15                                                 )

16 ==================================================
                   Read Comments Carefully Before Filling In

17 When and Where to File

18        You should file in the Northern District if you were convicted and sentenced in one of these

19 counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20 San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in

21 this district if you are challenging the manner in which your sentence is being executed, such as loss of

22 good time credits, and you are confined in one of these counties.  Habeas L.R. 2254-3(a).

23        If you are challenging your conviction or sentence and you were not convicted and sentenced in

24 one of the above-named fifteen counties, your petition will likely be transferred to the United States

25 District Court for the district in which the state court that convicted and sentenced you is located.  If

26 you are challenging the execution of your sentence and you are not in prison in one of these counties,

27 your petition will likely be transferred to the district court for the district that includes the institution

28 where you are confined.  Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS        - 1 -

1    <u>Who to Name as Respondent</u>

2         You must name the person in whose actual custody you are.  This usually means the Warden or

3    jailor.  Do not name the State of California, a city, a county or the superior court of the county in which

4    you are imprisoned or by whom you were convicted and sentenced.  These are not proper

5    respondents.

6         If you are not presently in custody pursuant to the state judgment against which you seek relief

7    but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8    custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9    was entered.

10   <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11        1.  What sentence are you challenging in this petition?

12        (a)    Name and location of court that imposed sentence (for example; Alameda

13               County Superior Court, Oakland):
               Santa Clara County

14             Superior Court                        Palo Alto, CA

15               Court                            Location

16        (b)    Case number, if known    BB256062

17        (c)    Date and terms of sentence  40 years to life; 1/26/04

18        (d)    Are you now in custody serving this term?  (Custody means being in jail, on

19               parole or probation, etc.)       Yes   X       No _____

20             Where?   California Department of Corrections

21             Name of Institution:  Pleasant Valley State Prison

22             Address:  P. O. Box 8500, Coalinga, CA 93210

23        2.  For what crime were you given this sentence?  (If your petition challenges a sentence for

24   more than one crime, list each crime separately using Penal Code numbers if known.  If you are

25   challenging more than one sentence, you should file a different petition for each sentence.)

26   Second degree murder; Cal. Penal Code, § 137

27   _____

28   _____

PET. FOR WRIT OF HAB. CORPUS        - 2 -

3. Did you have any of the following?

    Arraignment:                              Yes __X__      No _____

    Preliminary Hearing:                  Yes __X__      No _____

    Motion to Suppress:                  Yes _____      No __C__

4. How did you plead?

    Guilty _____    Not Guilty __X__    Nolo Contendere _____

    Any other plea (specify) __No_____

5. If you went to trial, what kind of trial did you have?

    Jury __X__    Judge alone _____    Judge alone on a transcript _____

6. Did you testify at your trial?           Yes __X__      No _____

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment               Yes __X__      No _____

    (b)    Preliminary hearing        Yes __X__      No _____

    (c)    Time of plea              Yes __X__      No _____

    (d)    Trial                    Yes __X__      No _____

    (e)    Sentencing              Yes __X__      No _____

    (f)    Appeal                 Yes __X__      No _____

    (g)    Other post-conviction proceeding    Yes __X__      No _____

8. Did you appeal your conviction?        Yes __X__      No _____

    (a)    If you did, to what court(s) did you appeal?

            Court of Appeal          Yes __X__      No _____

            Year: __2004___    Result: __Affirmed; 3/29/06_____

            Supreme Court of California    Yes __X__      No _____

            Year: __2006___    Result: __Denied; 12/20/06_____

            Any other court          Yes _____      No _____

            Year: _____    Result:_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

1    petition?                                    Yes __X__    No_____

2    (c)    Was there an opinion?                 Yes __X__    No_____

3    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                 Yes _____   No __X__

5    If you did, give the name of the court and the result:

6    _____

7    _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?    Yes __X__    No_____

10    [Note:  If you previously filed a petition for a writ of habeas corpus in federal court that

11    challenged the same conviction you are challenging now and if that petition was denied or dismissed

12    with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13    for an order authorizing the district court to consider this petition.  You may not file a second or

14    subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28

15    U.S.C. §§ 2244(b).]

16    (a)    If you sought relief in any proceeding other than an appeal, answer the following

17    questions for each proceeding.  Attach extra paper if you need more space.

18    I.    Name of Court: United States Supreme Court

19          Type of Proceeding: Petition for Writ of Certiorari

20          Grounds raised (Be brief but specific):

21          a. Improper argument by prosecutor violated
             federal due process

22          b. Discovery violation by prosecution violated
             due process

23          c._____

24          d._____

25          Result: Denied                    Date of Result: 5/14/07

26    II.   Name of Court: _____

27          Type of Proceeding: _____

28          Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS          - 4 -

1          a._____

2          b._____

3          c._____

4          d._____

5          Result: _____Date of Result:_____

6    III.   Name of Court: _____

7          Type of Proceeding: _____

8          Grounds raised (Be brief but specific):

9          a._____

10         b._____

11         c._____

12         d._____

13         Result: _____Date of Result:_____

14   IV.    Name of Court: _____

15         Type of Proceeding: _____

16         Grounds raised (Be brief but specific):

17         a._____

18         b._____

19         c._____

20         d._____

21         Result: _____Date of Result:_____

22   (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                                   Yes _____    No X____

24         Name and location of court: _____

25   B. GROUNDS FOR RELIEF

26         State briefly every reason that you believe you are being confined unlawfully. Give facts to

27   support each claim. For example, what legal right or privilege were you denied? What happened?

28   Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS          - 5 -

1    need more space.  Answer the same questions for each claim.

2        [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

3    petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4    499 U.S. 467,  111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5    Claim One:  Improper instructions on self-defense violated

6    federal due process

7    Supporting Facts:  See Attachment Number 1

8

9

10

11    Claim Two:  Improper instructions on imperfect self-defense

12    violated federal due process

13    Supporting Facts:  See Attachment Number 2

14

15

16

17    Claim Three:  Erroneously incomplete instructions on initial

18    aggressor regaining right to self-defense violated

19    federal due process
      Supporting Facts:

20    See Attachment Number 3

21

22

23    If any of these grounds was not previously presented to any other court, state briefly which

24    grounds were not presented and why.

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 6 -

1   need more space.  Answer the same questions for each claim.

2       [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

3   petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5   Claim One:          FOUR          Erroneous and incomplete instructions

6       on imperfect self-defense violated federal due process

7   Supporting Facts:    See Attachment Number 4

8   _____

9   _____

10  _____

11  Claim Two:          FIVE          Prosecutorial misconduct during closing

12      argument violated federal due process

13  Supporting Facts:    See Attachment Number 5

14  _____

15  _____

16  _____

17  Claim Three:        SIX          Discovery violations as to the credibility

18      of a prosecution witness violated federal due process

19  Supporting Facts:    See Attachment Number 6

20  _____

21  _____

22  _____

23      If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why

25  _____

26  _____

27  _____

28  _____

PET. FOR WRIT OF HAB. CORPUS        -6A-

1   need more space.  Answer the same questions for each claim.

2        [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

3   petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5   Claim One:        SEVEN        Cumulative effect of all errors raised

6             in Claims 1-6 violated federal due process

7   Supporting Facts:        See Attachments 1-6

8

9

10

11   Claim Two:

12

13   Supporting Facts:

14

15

16

17   Claim Three:

18

19   Supporting Facts:

20

21

22

23        If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25                    NONE

26

27

28

PET. FOR WRIT OF HAB. CORPUS        -6B-

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2 are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3 of these cases:

4 For Claims One through Six, see cases cited in Attachments

5 1 through 6.  As to Claim 7 see Cooper v. Sowders (6th Cir.

6 837 F.2d 284, 286-288.

7 Do you have an attorney for this petition?                    Yes __X__    No____

8 If you do, give the name and address of your attorney: Arthur Dudley, SBN-056921

9 605 Center Street, Santa Cruz, CA  95060.    (831) 429-9966

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11 this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13 Executed on __May 8, 2008__                    _Ronald Paul McKeans_

14              Date                               Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS        - 7 -

## ATTACHMENT NUMBER 1

<u>Improper Instructions that Diluted the Law of Self-Defense:</u>

The trial court committed federal constitutional error in its instructions with regard to the principles of self-defense when it gave a group of instructions which, in essence, effectively told the jury that for petitioner to be able to claim self-defense in this case, the ultimate murder victim must have, at a minimum, first committed the criminal offense of assault upon petitioner. The reason why this group of instructions was erroneous is that actual danger from the victim is not necessary to justify the application of the self-defense doctrine; all that is necessary is that the defendant actually believed in that danger and there is a reasonable basis for that belief. (See CALJIC Nos. 5.12, 5.51.)

In this case, the trial court gave a full panoply of instructions on the principles of self-defense. Specifically, the trial court instructed the jury on justifiable homicide in self-defense (CALJIC No. 5.12), the burden of proof with regard to such self-defense (CALJIC No. 5.15), self-defense against assault (CALJIC No. 5.30), an assaulted person need not retreat (CALJIC No. 5.50), actual danger is not necessary (CALJIC No. 5.51), the right to self-defense ceases when the danger ceases (CALJIC No. 5.52), the right to self-defense by an initial aggressor (CALJIC No. 5.54), and the right to self-defense may not be contrived (CALJIC No. 5.55). (R.T. 975-977, 978-979;

C.T. 324-327, 330-335.)

However, what happened in this case is that immediately after the trial court instructed the jury on the principles concerning self-defense against an assault as contained in CALJIC No. 5.30 (R.T. 976-977; C.T. 327), the trial court proceeded to instruct the jury on the standard definition for the crime of assault as appearing in CALJIC No. 9.00 and CALJIC No. 9.01 (R.T. 977-978; C.T. 328-330).

With regard to the problem in issue what the trial court initially said was as follows: "It is lawful for a person who is being _assaulted_ to defend himself from attack if, as a reasonable person, he has grounds for believing, and does believe, that bodily injury is about to be inflicted on him. In doing so, the person may use all force and means which he believes to be reasonably necessary, and which would appear to a reasonable person in the same or similar circumstances to be necessary, to prevent the injury which appears to be imminent." (Emphasis added.) (R.T. 976-977; C.T. 327.)   However, immediately following this instruction on the principle of self-defense, which used the word "assaulted," the trial court proceeded to give the standard definition for the crime of assault. That rather lengthy standard definition of what constitutes the crime of assault went as follows:

> "In order to prove an assault, each of the following elements must be proved: One, a person willfully and unlawfully committed an act which by its nature would probably and directly result in the application of physical force on another

2

person. Two, the person committing the act was aware of the facts that would lead a reasonable person to realize that as a direct and natural and probable result of this act that physical force would be applied to another person. And, three, at the time the act is committed, the person committing the act had the present ability to apply physical force to the other person.

"The word willfully means that the person committing the act did so intentionally. However, an assault does not require an intent to cause injury to another person or an actual awareness of the risk that injury might occur to another person.

"To constitute an assault, it is not necessary that any actual injury be inflicted. However, if an injury is inflicted, it may be considered in connection with other evidence in determining whether an assault was committed. A willful application of physical force upon the person of another is not unlawful when done in lawful self-defense.

"A necessary element of an assault is that the person committing the assault had the present ability to apply physical force to the person of another. This means that, at the time of the act which by its nature would probably and directly result in the application of physical force upon the person of another, the perpetrator of the act must have the physical means to accomplish the result -- that result. If there is this ability, present ability exists even if there is no injury." (R.T. 977-978; C.T. 328-330.)

By including in its instructions to the jury the standard definition for the crime of assault, right after the standard jury instruction on self-defense against an assault, what the trial court did was to tell the jury that in order for the defense of self-defense to be applicable, it must be proved that the victim first committed the crime of assault upon petitioner. More specifically, the instruction on self-defense against assault talked about how it was lawful for a person who was being "assaulted" to defend himself from an attack. Then,

3

the trial court defined the concept of "assault," and stated that for there to be an assault a number of elements had to be proved. Those elements included that a person (i.e., in this case the ultimate victim) willfully and lawfully committed an act which by its nature would probably and directly result in the application of physical force on another person (i.e., in this case petitioner); that at the time the act was committed, the person (i.e., in this case the ultimate victim) intended to use physical force upon another person (i.e., in this case petitioner) or to do an act that was substantially certain to result in the application of physical force upon another person (i.e., in this case petitioner); and that at the time the act was committed, the person (i.e., in this case the ultimate victim) had the present ability to apply physical force to the person of another (i.e., in this case petitioner).

All of the above-discussed instructions clearly and unequivocally suggested to the jury that in order for petitioner to be able to claim self-defense in this matter, it was necessary first to prove that the ultimate victim committed a full and complete criminal assault upon petitioner, including the fact that the ultimate victim intended to use physical force upon another person or to do an act that was substantially certain to result in the application of physical force upon another person. This idea that the concept of self-defense is only applicable if there is proof that the ultimate victim committed the actual crime of assault, finds no basis whatsoever in the law of self-defense in the State of

California.

It is well settled in California that with regard to the principles of self-defense, actual danger (i.e., an actual assaultive type crime being committed by the ultimate victim upon the defendant) is not necessary as long as there is a reasonably apparent danger. (See People v. Wyatt (1972) 22 Cal.App.3d 671, 679; People v. Garcia (1969) 275 Cal.App.2d 517, 522; People v. Jackson (1965) 233 Cal.App.2d 639, 641-643; People v. Collins (1961) 189 Cal.App.2d 575, 588; see also CALJIC No. 5.51.) As the Court of Appeal said in People v. Dawson (1948) 88 Cal.App.2d 85, 96, ". . . it does not matter whether such danger was real or apparent. [Citations.] If [a] defendant acted from reasonable and honest convictions he [or she] cannot be held criminally responsible for a mistake in the actual extent of the danger, when other reasonable men [or women] would alike have been mistaken." (Accord People v. Jackson, supra, 233 Cal.App.2d 639, 642.)

Accordingly, it was error for the trial court to interject into its instructions on self-defense the concept that there needs to be proof of an actual assault, with all of its necessary elements, being committed by the victim before the defense of self-defense would be available to petitioner.

Furthermore, what complicates the error in question is that the trial court in defining the specific elements of the crime of assault said it was necessary for such elements to be "proved." (R.T. 977; C.T. 328.) This

suggests that someone, apparently the beneficiary of the defense of self-defense (i.e., the defendant), must "prove" that an assault was being committed by the ultimate victim upon the defendant before the defendant could claim self-defense. This type of language, of a burden to prove something being put upon a defendant, is contrary to well established law that it is the prosecution's obligation, when the defense of self-defense is raised, to prove beyond a reasonable doubt the absence thereof. (See People v. Pineiro (1982) 129 Cal.App.3d 915, 920; People v. Banks (1976) 67 Cal.App.3d 379, 384; see also People v. Cornett (1948) 33 Cal.2d 33, 44; CALJIC No. 5.15.)

Additionally, what also complicates the error in issue is that at one point in defining the elements of the crime of assault, the trial court told the jury that "[a] willful application of physical force upon the person of another is not unlawful when done in lawful self-defense." (R.T. 977; C.T. 328.) By putting this latter self-defense concept into the erroneous instructions in question, the trial court interjected the idea that if the ultimate victim in this matter were somehow acting in self-defense himself, then that person's conduct would not constitute the crime of assault. In turn, this would suggest to the jury, under the instructions given, that petitioner would be unlawfully defending himself from an assault if the ultimate victim were acting in self-defense.

To superimpose into the instructions in this case a concept that petitioner could not be lawfully acting in self-defense if there were evidence

to show that the victim might be acting in self-defense clearly misstates the applicable law on self-defense. The central focus of the defense of self-defense, from a defendant's perspective, is what is reasonably apparent and not what is real or actual. Whether or not the ultimate victim may have been acting in self-defense is legally irrelevant to self-defense.

## ATTACHMENT NUMBER 2

<u>Improper Instructions that Diluted the Law of Imperfect Self-Defense</u>:

The trial court committed federal constitutional error in its instructions with regard to the principles of imperfect self-defense when the trial court gave a group of instructions which, in essence, effectively told the jury that for petitioner to be able to claim imperfect self-defense, the ultimate victim must have first committed an act upon petitioner that would be an imminent peril to petitioner's life or would imminently cause great bodily injury to petitioner. The reason why this group of instructions was erroneous is that actual danger from the victim is not necessary to justify the application of the imperfect self-defense doctrine; all that is necessary is an appearance of danger that is actually believed by petitioner. (See CALJIC No. 5.17.)

The trial court gave a full panoply of instructions on the principles of imperfect self-defense. Specifically, the trial court instructed the jury that an actual, but unreasonable, belief of self-defense can be voluntary manslaughter (i.e., imperfect self-defense) (CALJIC No. 5.17). (R.T. 975-977, 978-979; C.T. 324-327, 330-335.)

Although the instruction on imperfect self-defense did not contain the word "assault" (R.T. 976; C.T. 520; see also CALJIC No. 5.17), the error raised in Claim Number 1 herein also infected the instruction on imperfect self-defense. First, the instruction on imperfect self-defense required

8

petitioner to believe in "imminent peril to life or great bodily injury." Second, the improper instruction on the standard definition of assault required the alleged victim to have committed "an act which by its nature would probably and directly result in the application of physical force" upon petitioner. Third, the jury was effectively told that in connection with the defense of self-defense the ultimate victim had to have committed the crime of assault before the defense of self-defense would be available to petitioner. Considering all three of these instructions as a whole, it would be logical and very easy for the jury to believe that imperfect self-defense would not be available to petitioner unless the ultimate victim initially committed against petitioner an act which by its nature would probably and directly result in the application of physical force that was an imminent peril to the life of petitioner, or would probably and directly result in great bodily injury to petitioner. Obviously, that would be a completely improper understanding of the law of imperfect self-defense, but that is exactly what the erroneous instructions in issue easily could have lead the jury to believe was the law in this case.

What complicates the error in question, as to the principle of imperfect self-defense, is that the trial court in defining the specific elements of the crime of assault said it was necessary for such elements to be "proved." (R.T. 977; C.T. 328.) This suggests that someone, apparently the beneficiary of the defense of imperfect self-defense (i.e., the defendant), must "prove" that some

act of imminent peril to life, or one that imminently would cause great bodily injury, was being committed by the ultimate victim upon the defendant before the defendant could claim imperfect self-defense. This type of language, of a burden to prove something being put upon a defendant, is contrary to well established law that it is the prosecution's obligation, when the mitigating concept of imperfect self-defense is raised, to prove beyond a reasonable doubt the absence thereof. (See People v. Pineiro (1982) 129 Cal.App.3d 915, 920; People v. Banks (1976) 67 Cal.App.3d 379, 384; see also People v. Cornett (1948) 33 Cal.2d 33, 44; CALJIC No. 5.15.)

Additionally, what also complicates the error in issue is that at one point in defining the elements of the crime of assault, the trial court told the jury that "[a] willful application of physical force upon the person of another is not unlawful when done in lawful self-defense." (R.T. 977; C.T. 328.) By putting this latter self-defense concept into the erroneous instructions in question, the trial court interjected the idea that if the ultimate victim in this matter were somehow acting in self-defense himself, then that person's conduct would not constitute the crime of assault. In turn, this would suggest to the jury, under the instructions given, that petitioner would be unlawfully defending himself from an assault if the ultimate victim were acting in self-defense.

To superimpose into the instructions in this case a concept that petitioner could not be lawfully acting in self-defense, if there were evidence

10

to show that the victim might be acting in self-defense, not only misstates the applicable law on self-defense as discussed in Claim Number 1, but it also erroneously distorts the law of imperfect self-defense. As has been discussed thoroughly hereinabove, the central focus of the defense of self-defense, from a defendant's perspective, is what is reasonably apparent and not what is real or actual. As to the mitigating concept of imperfect self-defense, the central focus thereof, from a defendant's perspective, is what is actually believed by the defendant. Whether or not the ultimate victim may have been acting in self-defense is legally irrelevant not only to self-defense, but also to imperfect self-defense.

## ATTACHMENT NUMBER 3

<u>Erroneously Incomplete Instructions on the Legal Concept of Self-Defense by an Aggressor</u>:

The trial court committed federal constitutional error by giving an instruction to the jury on the availability of self-defense by the initial aggressor which failed to contain the proviso that some or all of the requirements that would make self-defense available to an initial aggressor can be excused if the counterattack by the ultimate victim is so sudden and perilous that the initial aggressor cannot withdraw.

In this case, the trial court gave the standard CALJIC instruction on the right to self-defense by an aggressor as it appeared in the Sixth and Seventh Editions of the CALJIC instructions. This instruction (CALJIC No. 5.54) in substance told the jury that the right to self-defense by the initial aggressor is available only after, among other things, the initial aggressor has clearly informed the other person that he or she wants to stopped fighting, and the initial aggressor has clearly informed the other person that he or she has stopped fighting.[1]

However, what the instruction in question failed to include was the rule

---

1. As read to the jury, the instruction in issue said, "[t]he right of self-defense is only available to a person who initiated the assault if he has done all the following . . . number one, he has actually tried in good faith to refuse to continue fighting. Two, he has clearly informed his opponent that he wants to stop fighting. Three . . . he has clearly informed his opponent that he has stopped fighting. After he has done these three things, he has the right to self-defense if his opponent continues the fight." (R.T. 979; C.T. 528.)

of law that the initial aggressor can be excused from the various withdrawal requirements if "'. . . the attack is so sudden and perilous that he cannot withdraw.'" (People v. Quach (2004) 116 Cal.App.4th 294, 302; accord People v. Sawyer (1967) 256 Cal.App.2d 66, 75, fn. 2.) Stated in another manner, where the counterattack is so sudden and perilous that no opportunity is given to decline further to fight and one cannot retreat with safety, then the initial attacker is justified in slaying in self-defense. (People v. Gleghorn (1987) 193 Cal.App.3d 196, 201.)

The above-discussed proviso is fully applicable to this case. Under petitioner's version of the events, petitioner could have been construed as the initial aggressor when petitioner pulled out a gun from his back pocket when the ultimate victim of the murder merely turned around to face petitioner. Based upon what occurred thereafter the jury, following the precise language of CALJIC 5.54, which literally set out an absolute requirement of successful notification of a declination to continue the fight, could only have believed that petitioner, by merely walking backward with the gun still his hand, had failed to give the ultimate victim adequate and sufficient indications of petitioner's desires to stop fighting and the fact that petitioner had stopped fighting.

As worded, the instruction in question completely precluded the jury from considering the additional rule that the necessary notification of a declination to continue the fight is not necessary where the counterattack is so

sudden and perilous that petitioner did not have the opportunity to communicate his desires to stop fighting. Properly instructed the jury could have believed that rule to be applicable based upon petitioner's testimony that after the ultimate victim had turned around, grabbed petitioner's gun and then let go of the gun, petitioner started to back up, but then the ultimate victim lunged toward petitioner with his hands at shoulder height in a clenching grip posture, whereupon petitioner turned his body, got his neck out of the way, fired the gun and apparently did not actually observe the victim at the time of the shot. Whether this was the case, and whether petitioner was still entitled to the right to self-defense, even though he may have been the initial aggressor, were matters to be determined by the jury with proper instructions on the subject. That clearly did not occur in this case.

**ATTACHMENT NUMBER 4**

<u>Erroneous and Incomplete Instructions on Imperfect Self-Defenses:</u>

The trial court committed federal constitutional error in connection with its instructions on imperfect self-defense when it failed to instruct the jury that standard concepts applicable to issues of true self-defense, such as the assailed person need not retreat (CALJIC No. 5.50), actual danger is not necessary (CALJIC No. 5.51) and the regaining of the right to self-defense by the initial aggressor, including the additional proviso just discussed in the immediately preceding issue (CALJIC No. 5.54), are equally applicable to the mitigating concept of imperfect self-defense.

In this case, the trial court gave the standard CALJIC instruction on imperfect self-defense contained in CALJIC No. 5.17. (R.T. 976; C.T. 520.) In substance, the jury instruction on imperfect self-defense advised the jury that imperfect self-defense would be available to reduce the charged offense of murder to voluntary manslaughter if petitioner had an actual, but unreasonable, belief in the necessity to defend himself against imminent peril to his life or great bodily injury to himself. The instruction then went on to give a definition to the words "imminent peril," explained that the imminent peril must have existed or appeared to petitioner to have existed at the very time the fatal shot was fired, and concluded by saying that the principle of imperfect self-defense ". . . is not available and malice aforethought is not

15

negated if the [d]efendant by his wrongful conduct created the circumstances which legally justified his adversary's use of force, attack, or pursuit." (R.T. 976; C.T. 520.)

However, the trial court never instructed the jury that certain critical concepts applicable to the true defense of self-defense were also applicable to the concept of imperfect self-defense, such as, the assailed person need not retreat (CALJIC No. 5.50), actual danger is not necessary (CALJIC No. 5.51) and the regaining of the right to self-defense by the initial aggressor, including the additional proviso just discussed in the immediately preceding issue (CALJIC No. 5.54).

Initially, it is well established that there are "close conceptual similarities" between imperfect (i.e., unreasonable) self-defense and the "actual" defense of "true" self-defense. (People v. Breverman, supra, 19 Cal.4th 142, 159.) As the California Supreme Court stated in People v. Barton (1995) 12 Cal.4th 186, 199-200, "[t]he *sole difference* between true self-defense and 'unreasonable self-defense' is that the former applies only when the defendant acts in response to circumstances that cause the defendant to fear, and would lead a reasonable person to fear, the imminent infliction of death or great bodily injury [citations]; unreasonable self-defense, on the other hand, does not require the defendant's fear to be reasonable." (Italics added and deleted.)

16

If, as the California Supreme Court noted in the <u>Barton</u> case, the sole difference between imperfect (unreasonable) self-defense and true self-defense is the aspect that imperfect self-defense does not require the defendant's fear to be reasonable, then all of the ancillary rules of self-defense, such as, the assailed person need not retreat (CALJIC No. 5.50), actual danger is not necessary (CALJIC No. 5.51) and the regaining of the right to self-defense by the initial aggressor, including the additional proviso just discussed in the immediately preceding issue, are equally applicable to imperfect self-defense. However, in this case, these critical matters were never told to the jury by way of appropriate instructions from the trial court. That was error.

Furthermore, the error in question was compounded by the fact that in the standard instruction on imperfect self-defense the jury was told that imperfect self-defense ". . . [was] not available and malice aforethought [would] not [be] negated if the [d]efendant by his wrongful conduct created the circumstances which legally justified his adversary's use of force, attack, or pursuit." (R.T. 976; C.T. 520) While this portion of the instruction on imperfect self-defense is correct as far as it goes (see <u>In re Christian S.</u> (1994) 7 Cal.4th 768, 773, fn. 1, which is apparently the source for this part of the standard CALJIC instruction on imperfect self-defense), it becomes an inaccurate, misleading and erroneous statement of the law, where, as in the instant case, there is an evidentiary basis for giving, as the trial court did in this

case for the true defense of self-defense, an instruction on the right of the initial aggressor to regain the availability of the defense of self-defense.

In fact, in footnote 1 of the <u>Christian S.</u> case, which appears to be the legal basis for the above-quoted proposition contained in CALJIC No. 5.17 for denying a defendant the availability of imperfect self-defense where the defendant's wrongful conduct created the circumstances for the adversary's use of force, the California Supreme Court goes on in that footnote to limit that rule to circumstances ". . . under which [the] adversary's attack or pursuit is *legally justified*." (Italics added) (<u>In re Christian S., supra</u>, 7 Cal.4th 768, 773, fn. 1.) One of those circumstances where the adversary's attack would not be legally justified is where the defendant has regained the availability to defend one's self because of the adversary's own improper attack, or at least where the defendant actually believes in the existence of the adversary's own improper attack.

## ATTACHMENT NUMBER 5

<u>Prosecutorial Misconduct Involving a Significant Misstatement of the
Law During Closing Arguments</u>:

The prosecutor, during his closing arguments to the jury, committed a

serious act of misconduct that constituted federal constitutional error when,

over defense counsel's objections, the prosecutor was permitted to argue to the

jury that when a killing is proved to have been committed by a defendant, and

nothing further is shown, the presumption of the law is that the killing was

malicious and an act of murder.

Preliminarily, in its instructions to the jury, the trial court gave a full

compliment of jury instructions concerning first degree murder, second degree

murder and voluntary manslaughter. Those instructions included the standard

CALJIC instructions defining homicide (CALJIC No. 8.00), defining murder

(CALJIC No. 8.10), defining malice aforethought (CALJIC No. 8.11),

defining deliberate and premeditated murder (CALJIC No. 8.20), defining

umpremeditated murder of the second degree (CALJIC No. 8.30), defining

second degree murder based upon a killing resulting from an unlawful act

dangerous to life (CALJIC No. 8.31), explaining the duty of the jury as to

determining the degree of murder (CALJIC No. 8.70), explaining the issue of

reasonable doubt as to whether the homicide was first or second degree murder

(CALJIC No. 8.71), defining voluntary manslaughter (CALJIC No. 8.40),

defining the concept of sudden quarrel or heat of passion (CALJIC No. 8.42),

explaining the concept of a cooling off period distinguishing murder from manslaughter (CALJIC No. 8.43), explaining that no specific emotion alone constitutes heat of passion (CALJIC No. 8.44), distinguishing murder from manslaughter (CALJIC No. 8.50), defining the need for legal causation for the homicide (CALJIC No. 8.55), explaining the concept of reasonable doubt as to whether the homicide is murder or manslaughter (CALJIC No. 8.72), explaining how evidence of provocation may be considered in determining the degree of murder (CALJIC No. 8.73), the need for a unanimous verdict with regard to whether the offense is first degree murder, second degree murder or manslaughter (CALJIC No. 8.74), explaining the concept of returning a partial verdict with regard to the character of the homicide (CALJIC No. 8.75), and explaining how an actual but unreasonable belief in the necessity of self-defense is voluntary manslaughter (CALJIC No. 5.17). (R.T. 963-972, 976; C.T. 492-512, 520.)

Then, in closing arguments, the prosecutor, when discussing the law concerning murder said, in pertinent part, the following: "Deliberation and premeditation is not required for second-degree murder. It's just an intentional killing, essentially, a killing done with malice, a killing done expressly with express malice or implied malice, an intentional act. Deliberation and premeditation are not required for second-degree murder. [¶] What's an example of second-degree murder? If A kills B and that's all you know, it's

second degree murder. And the quote here from a California case: 'When a killing is proved to have been committed by the defendant and nothing further is shown, the presumption applies that it was malicious and an act of murder.'" (R.T. 998.)

Shortly after the prosecutor made that argument, defense counsel interposed an objection that the prosecutor was making an inaccurate statement of the law with respect to second degree murder. (R.T. 999.) Moments later the jury was excused, and there was a discussion among counsel and the trial court concerning the appropriateness of the prosecutor's argument that when a killing is proved to have been committed and nothing further is shown, then a presumption applies that the killing was malicious and an act of murder. (R.T. 999-1002.) Even though the trial court thought that the argument in question undermined reasonable doubt and seemed to shift that burden, nevertheless, the trial court allowed the prosecutor to continue on with the type of argument in issue. (R.T. 1000, 1002.)

When the jury came back in, the prosecutor proceeded on with his argument as follows: "From the chart that you're looking at as an example of a second degree implied malice murder. And the case says 'It is settled that the necessary element of malice may be inferred from the circumstances of the homicide.' Implied malice, this is an example. So if A kills B and that's all you know, that's an implied malice second-degree murder. [¶] And the case

goes onto say 'When the killing is proved to have been committed by the defendant and nothing further is shown, the presumption of the law is that it was malicious and an act of murder.' In such a case, the verdict should be murder of the second-degree and not murder of the first degree, which is why this is an example of a second." (R.T. 1003.)

Admittedly, the prosecutor was initially correct in stating that there is case law which provides that when a killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of the law is that it was malicious and an act of murder. (People v. Anderson (1968) 70 Cal.2d 15, 36; People v. Craig (1957) 49 Cal.2d 313, 319; People v. Frye (1992) 7 Cal.App.4th 1148, 1154.) However, contrary to what the prosecutor said and did in the trial court, it is well settled that such language is never to be communicated to a jury (i.e., it is always excluded from jury consideration), since it improperly shifts the burden of proof to the defendant in a homicide case with regard to producing evidence mitigating murder to manslaughter, or otherwise totally eliminating murder by evidence of justification or excuse, such as, self-defense. (See People v. Kelley (1980) 113 Cal.App.3d 1005, 1009-1013; see also People v. Loggins (1972) 23 Cal.App.3d 597, 600-605.) In fact, in People v. Kelley, supra, 113 Cal.App.3d 1005, 1013, the appellate court specifically condemned the use of the type of hypothetical propounded by the prosecutor in this case that if A killed B, and that is all you know, it is

22

second degree murder.

In short, the principle that where there is a killing, and nothing further is shown, the presumption of the law is that the killing was malicious and an act of murder, is merely a procedural rule that imposes a duty of going forward with evidence and is something that a jury should never be told. (People v. Kelley, supra, 113 Cal.App.3d 1005, 1010-1013; People v. Loggins, supra, 23 Cal.App.3d 597, 601-603; see also People v. Deloney (1953) 41 Cal.2d 832, 840-842; People v. Cornett, supra, 33 Cal.2d 33, 42-43; People v. Garcia (1972) 27 Cal.App.3d 639, 647.)

What is particularly insidious about the legal statement made by the prosecutor to the jury is that it contained the concept of a "presumption." It must be kept in mind that the use of the word "presume," or its derivations, in an appellate opinion usually does not involve issues on legal principles to be communicated to a jury. Such words are generally used in an appellate opinion with regard to issues concerning a statement of substantive law or an analysis of an issue of sufficiency of evidence on appeal. (People v. Colantuono (1994) 7 Cal.4th 206, 220-221, including fn. 13 on p. 221.) Furthermore, by interjecting into a jury's consideration the concept of a "presumption," it creates a significant problem affecting the jury's proper role. As the California Supreme Court cautioned in People v. Colantuono, supra, 7 Cal.4th 206, 221, ". . . the jury must clearly understand their responsibility to

resolve [a] question beyond a reasonable doubt, uninfluenced and unassisted by any other principle of law. [Citations.] Moreover, in light of recent refinements by the United States Supreme Court regarding presumptions and their effect on the prosecution's burden of proof,[2] any reference to the word 'presumed' or its derivations can prove problematic on review. [Citations.]" (Fn. added.)    Thus, in the trial court, when it comes to explaining the applicable law to a jury, the word "presumed," and the word "presumption," need to be avoided.

It is clear that in the instant case the prosecutor in closing arguments to the jury made a serious and significant misstatement of the law when the jury was told on two different occasions that if A killed B and that is all you know, it is second degree murder, and that when a killing is proved to have been committed by a defendant and nothing further is shown, the presumption applies that it was malicious and an act of murder. (R.T. 998, 1003.) In this regard, it is settled that it is improper for a prosecutor to misstate the law generally, and particularly to attempt to absolve, as in the instant case, the prosecution from its prima facie obligation to overcome reasonable doubt on all elements. (People v. Hill (1998) 17 Cal.4th 800, 829; People v. Marshall (1996) 13 Cal.4th 799, 831; People v. Gonzalez (1990) 51 Cal.3d 1179, 1215.)

---

2. See Carella v. California (1989) 419 U.S. 263, 265-267 [105 L.Ed.2d 218]; Rose v. Clark (1986) 478 U.S. 570, 579-582 [92 L.Ed.2d 460]; Connecticut v. Johnson (1983) 460 U.S. 73, 84-86 [74 L.Ed.2d 823]; Sandstrom v. Montana (1979) 422 U.S. 510, 514-519 [61 L.Ed.2d 39].

Furthermore, it is petitioner's position that the particular error in question amounts to a federal constitutional error.  When a prosecutor's improper comment during closing argument to a jury impinges upon or violates a defendant's federal constitutional right or rights that comment itself is a federal constitutional violation. (See <u>United States v. Hastings</u> (1983) 461 U.S. 499, 507-509 [76 L.Ed.2d 96] [improper comment on the right not to testify at trial]; <u>Doyle v. Ohio</u> (1976) 426 U.S. 610, 619, including fn. 5 on pp. 614-615 [49 L.Ed.2d 91] [improper comment on exercise of right to remain silent after advisement of <u>Miranda</u> rights]; <u>Griffin v. California</u> (1965) 380 U.S. 609, 610-614 [14 L.Ed.2d 106] [improper comment on the right not to testify at trial]; <u>People v. Harvey</u> (1992) 2 Cal.4th 86, 153-154 [improper comment on the right not to testify at trial]; <u>People v. Vargas</u> (1973) 9 Cal.3d 470, 475, 478 [improper comment on the right not to testify at trial]; <u>People v. Givans</u> (1985) 166 Cal.App.3d 793, 801 [improper comment on exercise of right to remain silent after advisement of <u>Miranda</u> rights].)

In this case, the prosecutor's improper comments impermissibly impinged upon the federal constitutional protections against interjecting into a jury's consideration the concept of a presumption.  As such, the prosecutor's improper comments in issue constitute a federal constitutional violation.

The only remaining issue is whether the prosecutorial misconduct in question, which was not corrected by the trial court after an appropriate objection was interposed by defense counsel, constituted prejudicial error. As will be detailed hereinbelow, in light of the particular circumstances of this case, the misconduct in question, with regard to a significant misstatement of the law, is prejudicial.

In the underlying state trial court matter, a previous jury trial which resulted in a mistrial due to the jury being unable to reach a verdict. (C.T. 336-364.) Additionally, significant portions of that prior trial were augmented as part of the state court appellate record, including a reporter's transcript of the instructions read to the jury and the arguments of both the prosecutor and defense counsel at that earlier trial. (Augmented R.T. 434-580.) A review of those jury instructions indicate that there were no different defenses than those raised in the trial leading to petitioner's conviction. (Augmented R.T. 434-467.) Defense counsel's prior closing arguments focused on the concepts of self-defense, imperfect self-defense and sudden quarrel and heat of passion. (Augmented R.T. 524-556.) The prosecutor had the same basic arguments in both trials. However, there was one exception. At the first trial, when the prosecutor was discussing the elements of first degree murder, second degree murder and voluntary manslaughter, the prosecutor neither at that time, nor at any other time, during his arguments to the jury in the first trial brought up the

totally improper argument that if A kills B and that is all you know, it is second degree murder, and that when a killing is proved to have been committed by a defendant and nothing further is shown, the presumption applies that the killing was malicious and an act of murder.

In short, when the case against petitioner was tried without the improper argument in question (i.e., a presumption of second degree murder), the jury was unable to reach a verdict and a mistrial was declared. However, when there was a trial of petitioner's case with the improper misconduct of the prosecutor telling the jury about a presumption of second degree murder, the jury returned a verdict of second degree murder. Under the facts and circumstances of this case, these improper comments were not harmless error.

**ATTACHMENT NUMBER 6**

<u>Discovery Violations and New Evidence as to Issues Pertaining to the
Credibility of a Key Prosecution Witness</u>:

Due to various discovery violations concerning withheld materials

pertaining to the credibility of a key prosecution witness, and due to new

evidence discovered after petitioner's trial as to various matters pertaining to

the credibility of that same key prosecution witness, all of which were

presented to the trial court in a motion for new trial, federal constitutional error

occurred. As will be developed hereinbelow, the issue in question centers

around moral turpitude evidence pertaining to the credibility of prosecution

witness Dr. Gregory Schmunk who was the chief medical examiner who

testified at petitioner's trial as a witness called by the prosecution.

The pertinent facts pertaining to the issue now under consideration are

as follows: At petitioner's trial, Dr. Gregory Schmunk opined, among other

things, that when Carney (the ultimate victim) was shot by the single gunshot,

the firearm barrel was probably within a few inches (one or two inches) from

Carney's chest. Dr. Schmunk based this opinion on the fact that there was

gunpowder stippling (unburnt gunpowder residue) embedded in the skin

immediately around the gunshot wound in the chest and that the diameter of

this stippling was about one inch. (R.T. 621-624, 631.) Also, Dr. Schmunk

opined that at the time the bullet was fired into Carney's chest, Carney was not

moving forward. Dr. Schmunk based this opinion on the fact that at the scene

of the crime Carney was found on his back and on the fact that the single bullet wound to the chest resulted in a bullet going through, among other things, Carney's spinal cord and damaging that spinal cord. As a result of this spinal cord damage, it was Dr. Schmunk's opinion that if Carney had been moving forward at the time of the gunshot Carney would have collapsed forward. On the other hand, since Carney was found on his back, it was Dr. Schmunk's opinion that as a result of the spinal cord damage, Carney, who would have been immediately paralyzed from about the waist down, either was standing up and not moving, or was moving backward, at the time of the gunshot. (R.T. 625, 628-630, 632.)

Dr. Schmunk presented the above-described testimony at petitioner's trial on August 12, 2003. (R.T. 610, 613.) In testifying about his qualifications as a forensic pathologist, Dr. Schmunk established the following pertinent facts pertaining to his career: He graduated from the University of Southern California, School of Medicine in 1983. He began a pediatrics residency program at Children's Hospital in Los Angeles, but then had the opportunity to go back to college at the University of California at San Diego and join a group of researchers in immunology and pathology. After several years as a post-doctoral fellow researcher at the University of California in San Diego, he then decided to formally go into the field of pathology. He applied to and was accepted into, the Anatomic Pathology Training Program at the

University of Washington in Seattle, Washington. He spent two years in training at that university and then went to the King County Medical Examiner's Office in Seattle, Washington, for his forensic pathology fellowship. (R.T. 615.)

Thereafter, Dr. Schmunk's first real job as a forensic pathologist was in Sacramento County, California, where he was a pathologist for the coroner's office in that county. Next, he had a brief period of time following that employment where he was with the San Francisco Medical Examiner's Office. Then, sometime in about 1995, he was employed as the Chief Medical Examiner for Brown County, Wisconsin, which is in the area of Green Bay. He held that position for approximately just over four years when he received his employment as the Chief Medical Examiner in the coroner's office for the County of Santa Clara. At the time he was testifying at petitioner's trial on August 12, 2003, he had held his position as the Chief Medical Examiner in Santa Clara County for just over four years. (R.T. 613-614.)

Two days later, on August 14, 2003, while petitioner's trial was still continuing, an article appeared in the San Jose Mercury newspaper indicating that Dr. Gregory Schmunk, who was hired in Santa Clara County in 1999, to clear up that county's troubled Medical Examiner's Office, was facing arrest in Wisconsin for stealing books from his former employer and then failing to appear in court. The article went on to say that, according to the prosecutor in

Wisconsin, it was alleged that Dr. Schmunk had stolen approximately $400 worth of medical textbooks from Brown County in Wisconsin when he left his job as the medical examiner in that county in February 1999. (R.T. 840-841; Court Exhibit "C"; C.T. 578-579.)

The San Jose Mercury article then went on to indicate that Dr. Schmunk acknowledged taking the books and explained that he did so because Brown County owed him money. Dr. Schmunk also acknowledged that he refused to go to court in Green Bay after the charges were filed in November 2000. According to Dr. Schmunk all of his "cop friends" and all of his "D.A. friends" had told him to "forget about it." Dr. Schmunk added that he had no plans to return to Wisconsin to clear up the warrant. (Court Exhibit "C"; C.T. 578-579.)

On that same day, August 14, 2003, a hearing was held in the trial court in petitioner's matter in relation to the then very recent revelations concerning the theft incident and pending charges against Dr. Schmunk in Wisconsin. Early on in that hearing, the prosecutor in petitioner's case stated, with regard to any prior knowledge of the matters referred to in the newspaper article, "[e]verything that I know about this is nothing, so that's everything that I know." (R.T. 842.)

Additionally, at the hearing on August 14, 2003, Dr. Schmunk came in and testified under oath about his alleged misconduct back in Wisconsin. Dr.

Schmunk explained that up to February 2000, he had been in constant contact with the prosecutor back in Wisconsin, and then with a presiding judge in Brown County, trying to find out what specifically the officials in Wisconsin thought he (Dr. Schmunk) had in his possession that belonged to Brown County. Dr. Schmunk admitted that he had three or four textbooks in his possession, and he said that he had tried to get some official word that would indicate to him that if he returned those final few books that would satisfy the needs of the prosecutor in Wisconsin. Dr. Schmunk sent several letters to the prosecutor in Wisconsin and received several letters back which did not answer his overriding question as to what would satisfy that prosecutor's needs. When Dr. Schmunk could not receive a satisfactory answer, he wrote to the presiding judge in the Brown County area soliciting a resolution of the matter. (R.T. 864-865.)

Apparently, according to Dr. Schmunk, in his early communications with the officials in Brown County, those officials originally identified a list of about 25 things that they claimed that Dr. Schmunk still had in his possession. The doctor sent many of those things back. Then, he received, at various times some communications from Brown County adding a few extra things to the list, but then subtracting other things. By the end of 1999, according to Dr. Schmunk, he sent some things back and then all of a sudden the officials in Brown County would want something else. His last

correspondence was to the judge in Brown County in February 2000. Since then Dr. Schmunk had not heard anything from Brown County and just ignored the matter. (R.T. 865-868.) Dr. Schmunk admitted being aware of the arrest warrant since January or February 2000, and that he had done nothing since his last written communication in February 2000. (R.T. 869.) With regard to the "cop friends" and "D.A. friends" he talked to about the matter, all of those friends were individuals back in Brown County, Wisconsin. According to Dr. Schmunk, he was basically told by those friends that since he was making some reasonable efforts and he was not hearing back from the people, then maybe those people (the individuals in Brown County) just wanted to let it be. (R.T. 870.) Dr. Schmunk told only two people in Santa Clara County about the matters back in Wisconsin. One was a Santa Clara Count government executive by the name of Richard Wittenberg, and this occurred when Dr. Schmunk sent Wittenberg a letter about the matter in March 2000. Dr. Schmunk also told his program manager Diana Hunter about the Wisconsin matter. (R.T. 852-853, 870.)

After Dr. Schmunk's testimony there was considerable discussion between the trial court, the prosecutor and petitioner's trial counsel about what to do in petitioner's case, including the subject of a continuance. Ultimately, it was concluded by the trial court to continue on with petitioner's case and to allow petitioner's trial counsel to recall Dr. Schmunk and examine him before

the jury concerning the events in Wisconsin. (R.T. 881-882, 884, 889-890, 897-898, 901.)

On the next day, August 15, 2003, Dr. Schmunk was recalled by petitioner's trial counsel to testify before the jury in this case. (R.T. 910, 913.) Before the jury, Dr. Schmunk testified that he left Brown County, Wisconsin in February 1999, where he had been employed as a medical examiner. According to Dr. Schmunk's testimony before the jury, he actually first became aware of the outstanding criminal complaint against him in early 2002. He found out about this outstanding criminal complaint for the theft of the medical books from a reporter friend in Brown County. Dr. Schmunk believed he received this information from his reporter friend around January 2002. (R.T. 914-915.)

Dr. Schmunk explained that the medical textbooks in question had a value of about $400. (R.T. 917.)    The doctor also explained that when he left his job in Brown County in February 1991, he took everything very quickly all in one day in order to move because of his new job in Santa Clara County. (R.T. 917.)    The doctor admitted that his last correspondence with the prosecutor in Wisconsin, prior to his testimony at petitioner's trial, was in June 2000, and it was an attempt to resolve everything in Wisconsin. The doctor said he waited for a response, but he heard nothing. When he heard about the bench warrant, Dr. Schmunk wrote a judge to see if the judge could intervene

and resolve the matter. Dr. Schmunk wrote that judge in February 2002. The doctor did not do anything beyond that until August 14, 2003, the day before the doctor was then testifying before petitioner's jury. On that date (August 14, 2003) the doctor called the prosecutor in Wisconsin and resolved everything by sending a check to the prosecutor for the value of the medical textbooks. (R.T. 917-922.)

Thereafter, on August 19, 2004, the jury in petitioner's case returned a verdict finding petitioner guilty of second degree murder. (C.T. 547-552.)

Later, petitioner filed a motion for a new trial containing additional information about Dr. Schmunk which clarified and expanded upon the Wisconsin book theft incident and set forth some new revelations of Dr. Schmunk's past. (C.T. 566-568.) None of this new and additional information was ever contradicted by the prosecution. (C.T. 646-658.)

As developed in the various pleadings pertinent to petitioner's motion for new trial, the new and additional revelations concerning Dr. Schmunk were as follows:

On May 12, 1994, while Dr. Schmunk was working at the Sacramento County Coroner's Office, he got into an argument with his manager, one Robert Wood. (C.T. 602.) Apparently Dr. Schmunk and Wood had had a longstanding verbal conflict resulting in personality clashes between the two of them. (C.T. 607.) At 4:30 p.m., on May 12, 1994, Wood put a letter on Dr.

Schmunk's desk advising Dr. Schmunk that he (Dr. Schmunk) would no longer participate in a brain meth study unless directed by the coroner of Sacramento County.  (C.T.  601-602.)  After Wood put that letter on Dr. Schmunk's desk, Wood returned to his office to leave for the day.  Dr. Schmunk came into Wood's office and asked Wood if he (Dr. Schmunk) could talk with Wood in Dr. Schmunk's office.  Wood agreed and went with Dr. Schmunk to Dr. Schmunk's office.  Dr. Schmunk sat in his desk chair, put his feet up on the desk and asked Wood to sit down.  Wood did so.  Dr. Schmunk then told Wood, in a patronizing and condescending manner, that he (Dr. Schmunk) realized that Wood was only trying to help, but that Wood had caused Dr. Schmunk problems by not bringing the research request to him (Dr. Schmunk).  (C.T. 602.)

Wood then got up to leave.  Dr. Schmunk got between Wood and the door and prevented Wood from opening the door.  Dr. Schmunk said that he wanted to talk to Wood.  Wood told Dr. Schmunk that he (Wood) had to go.  Dr. Schmunk would not move.  Wood then went to the telephone in Dr. Schmunk's office, picked it up and dialed a Dr. Anthony.  Dr. Schmunk pulled the telephone cord from the wall.  (C.T. 602.)

Wood then went to the door.  However, Dr. Schmunk got between the door and Wood.  Wood began shouting "Let me out of hear."  Dr. Schmunk told Wood that he just wanted to talk to him.  Dr. Schmunk would not move

and continued to block the door. Wood grabbed Dr. Schmunk's coat collar and forcibly moved Dr. Schmunk aside. Wood then went down the hallway and yelled words to the effect that "If you do that to me again, I'll kill you – I'll rip your fucking head off – I'll fucking kill you." (C.T. 602.) At that time it apparently was common knowledge that Dr. Schmunk carried a gun. (C.T. 602, 604.)

Thereafter, on May 31, 1994, Robert Wood commenced a civil action against Dr. Schmunk for what occurred on May 12, 1994. (C.T. 609-610) An arbitration award was entered against Dr. Schmunk in the sum of $2,500 on March 14, 1995. (C.T. 611.) Full satisfaction of that judgment was acknowledged as of June 16, 1995. (C.T. 612.)

On December 10, 1999, Dr. Schmunk executed an application, under penalty of perjury, for a license to carry a concealed weapon. (C.T. 616.) Question 5 in that application asked, "Are you now, or have you been, a party to a lawsuit in the last five years?" Dr. Schmunk checked "No" for an answer. (C.T. 617.) Question 10 in that application asked, "Have you withheld any fact that might affect the decision to approve this license?" Again, Dr. Schmunk checked "No" for an answer. (C.T. 618.)

Next, on or about October 22, 2003, the Santa Clara County District Attorney's Office provided to petitioner's trial counsel, among other things, a confidential memorandum dated August 15, 2003, from Bill Larsen, a

Special Assistant District Attorney at the Santa Clara County District Attorney's Office, to Paula Kuty, a Chief Assistant District Attorney at the Santa Clara District Attorney's Office. (C.T. 568, 595.) In that confidential memorandum Special Assistant District Attorney Bill Larsen indicated that "[t]he attached articles copied from the April 9, 10 and 16, 1999, additions of the Green Bay Press - Gazette were brought to my attention on or about April 29, 1999." (C.T. 595.)

The article from April 9, 1999, indicated, among other things, that Dr. Schmunk was in a dispute with Brown County about 18 uncompleted autopsy reports that he did not finish and then took those 18 files with him when he resigned in February 1999. Dr. Schmunk had said the uncompleted autopsy reports were his professional responsibility to finish, but he would not finish them until Brown County paid him for his time. The county contended that Dr. Schmunk took those autopsy files without permission and said it would not pay him. (C.T. 596.)

The article from April 10, 1999, indicated that Dr. Schmunk had finished 3 of the 18 uncompleted autopsy reports that he had taken with him when he resigned to take a job in California, but that he was not backing down in his dispute with Brown County. Dr. Schmunk had indicated that he should be paid about $1,800 to finish the uncompleted autopsy reports. However, he said he would not withhold the uncompleted autopsy reports because he had

another bargaining chip. Brown County also wanted back about 20 items missing from the Medical Examiner's Office which were valued at about $1,700 to $1,800. These items included medical reference books, raincoats and a portable light. In that article Dr. Schmunk was quoted as saying "I can say to them 'You say there's some things that I have that are the property of Brown County. Well, I'm saying that you owe me some money. Let's work out a resolution.'" Dr. Schmunk also was quoted as saying, "Maybe what we'll end up saying is that it's a wash." (C.T. 598.)

The article of April 16, 1999, indicated that Dr. Schmunk had agreed to finish the 15 remaining uncompleted autopsy reports, the files for which he had taken with him when he left his job in Brown County. The article further indicated that Brown County also wanted back about $1,700 to $1,800 worth of medical reference books and other items that the county claimed Dr. Schmunk may have taken with him. Dr. Schmunk said that he did have some of the county's items but he planned to hold on to them until the county paid him the $1,800 he said the county owed him. The article also indicated that the agreement reached only dealt with the uncompleted autopsy reports and did not resolve the property issue. (C.T. 599.)

Turning to the merits of petitioner's claim, the instant case is a classic situation where the prosecution significantly failed to live up to its federal, constitutionally compelled discovery obligations (stemming from the due

process clause of the Fourteenth Amendment of the United States Constitution) to provide to the defense, even without a request, all substantial material evidence favorable to an accused, whether such evidence relates directly to the question of guilt, to matters relevant to punishment, or to the credibility of a material witness. (Kyles v. Whitley (1995) 514 U.S. 419, 432 [131 L.Ed.2d 490]; United States v. Bailey (1985) 473 U.S. 667, 682 [87 L.Ed.2d 481]; United States v. Agars (1976) 427 U.S. 97, 110-111 [49 L.Ed.2d 342]; Giglio v. United States (1972) 405 U.S. 150, 153 [31 L.Ed.2d 104]; Brady v. Maryland (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215]; In re Williams (1994) 7 Cal.4th 572, 611; People v. Ruthford (1975) 14 Cal.3d 399, 406; In re Ferguson (1971) 5 Cal.3d 525, 532-533.) Furthermore, this obligation extends to information that ". . . might lead the defense to favorable evidence." (In re Ferguson, supra, 5 Cal.3d 525, 532-533.)

Dr. Schmunk was obviously a material witness for the prosecution. He provided testimony critical the prosecution's case that was more than the mere cause of death. Dr. Schmunk provided critical testimony when he opined that when Carney was shot by the single gunshot, the firearm barrel was probably within a few inches (one or two inches) from Carney's chest. Dr. Schmunk based this opinion on the fact that there was gunpowder stippling (unburnt gunpowder residue) embedded in the skin immediately around the gunshot wound in the chest and that the diameter of this stippling was about one inch.

(R.T. 621-624, 631.) Also, Dr. Schmunk opined that at the time the bullet was fired into Carney's chest, Carney was not moving forward. Dr. Schmunk based this opinion on the fact that at the scene of the crime Carney was found on his back and on the fact that the single bullet wound to the chest resulted in a bullet going through, among other things, Carney's spinal cord and damaging that spinal cord. As a result of this spinal cord damage, it was Dr. Schmunk's opinion that if Carney had been moving forward at the time of the gunshot Carney would have collapsed forward. On the other hand, since Carney was found on his back, it was Dr. Schmunk's opinion that as a result of the spinal cord damage, Carney, who would have been immediately paralyzed from about the waist down, either was standing up and not moving, or was moving backward, at the time of the gunshot. (R.T. 625, 628-630, 632.) This was all very critical and material evidence to attempt to refute petitioner's claim that Carney lunged at petitioner just a moment before petitioner fired his gun in self-defense.

Next, based upon the memorandum dated August 15, 2003, at least one key member of the Santa Clara County District Attorney's Office, as early as April 29, 1999, some four years before the commencement of the trial leading to petitioner's conviction in this case, was fully aware of Dr. Schmunk's misconduct in Brown County, Wisconsin. (C.T. 595-599.) That misconduct not only consisted of the alleged theft of the medical textbooks and other

items, but the applicable information showed that for all practical purposes Dr. Schmunk was engaging in what can best be described as attempted acts extortion against officials in Brown County, Wisconsin, with regard to uncompleted autopsy reports. Such conduct clearly would be material information relevant to the impeachment of a witness who was called to testify at petitioner's trial as an expert witness in a field of expertise to which the acts of attempted extortion related. None of this pertinent information was provided to defense counsel by the Santa Clara County District Attorney's Office until on or about October 22, 2003, some two months after petitioner's trial. (C.T. 568.) This is the case even though the memorandum in question was dated August 15, 2003, which was a date on which petitioner's case was still proceeding with trial, and which coincidentally was the date on which Dr. Schmunk was recalled by the defense to testify before the jury. (C.T. 459, 595.)

Next, when Dr. Schmunk was recalled by the defense to testify at petitioner's trial, all defense counsel had was a very recent newspaper article discussing only the doctor's theft matter with regard to the textbooks. (R.T. 840-841; Court Exhibit "C"; C.T. 578-579.) The newspaper article did not mention anything about the attempted extortion with regard to the uncompleted autopsy reports. (C.T. 578-579.) That information was in the possession of the Santa Clara County District Attorney's Office for more than four years

prior to petitioner's trial, and still it was not discovered to petitioner's trial counsel before or during petitioner's trial. Again, it was two months after petitioner's trial before that this information was finally turned over to petitioner's trial counsel.

Moreover, after the revelations of the misconduct of Dr. Schmunk in relation to Brown County, Wisconsin, further investigation after the end of petitioner's trial resulted in the discovery of (1) Dr. Schmunk's confrontation when he worked at the coroner's office in Sacramento County and (2) what can clearly and unequivocally be described as outright perjury by Dr. Schmunk in his application to carry a concealed weapon. (C.T. 568, 600-618.)

Until the revelations concerning all of the Brown County misconduct, no reasonable person would have really suspected all of the transgressions committed by Dr. Schmunk. With the revelations of all of the Brown County matters, the additional matters were found concerning the Sacramento incident and the perjury in the gun permit application. Someone in possession of all of the Brown County information might reasonably expect such information could lead to other relevant information, just as it did in this matter. All of this critical information, except for the mere incident of the theft of the textbooks, was denied to petitioner's trial counsel by the discovery violation that occurred in this case.

Finally, without belaboring the point too much, it cannot be doubted

that due to (a) the critical importance of Dr. Schmunk's testimony, (b) the relevant and material nature of the impeachment evidence discussed hereinabove, major portions of which were denied to petitioner's trial counsel due to the prosecution's discovery violation, and (c) the true closeness of the evidence in petitioner's case as evidenced by the fact that a prior jury could not reach a verdict, there is a reasonable probability that had full and complete disclosure of the Brown County matters in question been made in a timely fashion, which then would have lead to the Sacramento incident and the perjury matter, the result in petitioner's case would have been different. This being the case, petitioner is entitled to a new trial. (See In re Sassounian (1995) 9 Cal.4th 535, 543-546; In re Pratt (1999) 69 Cal.App.4th 1294, 1312-1314.)

<u>PROOF OF SERVICE BY MAIL</u>

State of California          )
                             ) ss.
County of Santa Cruz         )

  I am a resident of the County of Santa Cruz.  I am over the age of eighteen and not a party to this action.  My business address is 605 Center Street, Santa Cruz, California 95060.

  On May 12, 2008, I served the within **PETITION FOR A WRIT OF HABEAS CORPUS**

on the interested parties in said action by placing a true copy, enclosed in a sealed envelope with postage fully prepaid, in the United States mail service at Santa Cruz, California, addressed as follows:

James A. Yates, Warden
Pleasant Valley State Prison
P. O. Box 8500
Coalinga, CA 93210-8500

Amy Haddix
Deputy Attorney General
Office of the Attorney General
State of California
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004

  I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed at Santa Cruz, California, on the date below.

Dated: May 12, 2008

ARTHUR DUDLEY