1
2
3
4
5
6
7
8
9
10
11

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

12  RONALD PAUL MCKEAN,                )    No. C 08-02450 JF (PR)
                                       )
13              Petitioner,            )    ORDER DENYING PETITION
                                       )    FOR WRIT OF HABEAS
14      vs.                            )    CORPUS AND DENYING
                                       )    REQUEST FOR CERTIFICATE
15  JAMES A. YATES, Warden,            )    OF APPEALABILITY
                                       )
16              Respondent.            )
                                       )
17  _____   )

18          Petitioner, a California prisoner proceeding pro se, seeks a writ of habeas corpus

19  pursuant to 28 U.S.C. § 2254.  The Court ordered Respondent to show cause why the

20  petition should not be granted.  Respondent filed an answer and a supporting

21  memorandum of points and authorities addressing the merits of the petition, and

22  Petitioner filed a traverse.  Having reviewed the papers and the underlying record, the

23  Court concludes that Petitioner is not entitled to habeas corpus relief and will deny the

24  petition.

25                          **PROCEDURAL BACKGROUND**

26          On August 19, 2003, a Santa Clara Superior Court jury convicted Petitioner of

27  second degree murder, in violation of California Penal Code § 187, with enhancements

28

for personal use of a firearm and intentional discharge of a firearm resulting in death, pursuant to California Penal Code §§ 12022.5 and 12022.53. On January 26, 2004, the trial court sentenced Petitioner to forty years to life in prison.

Petitioner appealed the judgment. On August 29, 2006, the California Court of Appeal affirmed. On December 20, 2006, the California Supreme Court denied review. On May 14, 2007, the United States Supreme Court denied Petitioner's petition for writ of certiorari.

Petitioner filed the instant federal action on May 13, 2008.

## FACTUAL BACKGROUND

Petitioner does not dispute the following facts, which are taken from the unpublished opinion of the California Court of Appeal[1]:

> On January 11, 2002, around 6:20 a.m., [Petitioner] and Joseph Carney, residents at a homeless shelter, got into an argument and exchanged insults belly to belly. Carney was mad at [Petitioner] for throwing out his deodorant. Carney suggested they fight it out like men in a boxing ring at the YMCA. FN2. [Petitioner] replied, "Why don't I just go out and get my gun and shoot you" and "What if I blew your fucking brains out[.]" Carney again suggested a boxing match, and [Petitioner] said, "Well, do you want me to kill you now or kill you later?" A shelter worker heard them arguing and told them to go outside. At that point, Carney gathered his toiletries and went to the bathroom. [Petitioner] waited for him to leave, then went to his car, and got his handgun. He returned to the shelter, found Carney in the bathroom, and shot him to death. [Petitioner] went back to his car, disabled his gun, and put it on the hood. Richard Farris, another shelter resident, approached [Petitioner], and [Petitioner] asked him for a cigarette. Farris noticed the gun and nervously asked about it. [Petitioner] said, "Don't laugh." "I shot him. I'll probably get 20 years[.]"

> FN2. Carney was 5 feet 10 inches tall and weighed 305 pounds; [Petitioner] is 5 feet 8 inches tall and weighs 187 pounds.

> Doctor Gregory Schmunk, Chief Medical Examiner of the Santa Clara County Coroner's Office, examined Carney's body and reviewed and signed the autopsy report prepared by Doctor Gleckman, one of his medical examiners. He testified as an expert in forensic pathology. He explained that gunpowder stippling on Carney's chest indicated that the gun was fired from a few inches away. Because Carney was found lying on his back, Doctor Schmunk further opined that he was standing still or backing up when shot. He explained that if Carney had been moving

---

[1] People v. McKean, No. H027008, California Court of Appeal, Sixth Appellate District (August 29, 2006). (Resp. Ex. 6, p. 2-6.)

Order Denying Petition for Writ of Habeas Corpus and Denying Request for Certificate of Appealability
P:\PRO-SE\SJ.JF\HC.08\McKean02450_hcruling.wpd

2

forward, his momentum would have caused him to fall forward. He discounted the possibility that Carney may have staggered around before falling because the bullet penetrated his spinal cord, which would have caused instant paralysis.

## The Defense

[Petitioner] testified that his job at the shelter was cleaning the bathroom. He threw out Carney's deodorant, and, when Carney got upset about it, [Petitioner] said he was just doing his job. Carney said he did not like [Petitioner's] self-righteous attitude, pinned him against some cabinets, and cocked his fist. [Petitioner] feared Carney because he was so big. At that point, a shelter worker told them to "take it outside." Carney again condemned [Petitioner's] attitude, and each said he wanted to kick the other's ass. Carney suggested a boxing ring, but [Petitioner] thought this was ridiculous. He had some physical injuries and had never boxed before. However, feeling fearful, nervous, trapped, jittery, and anxious, [Petitioner] said, "How about I shoot you in the head[.]" He meant his comment as an overstatement.

Carney and [Petitioner] separated, but Carney warned, "I walk softly and carry a big stick." [Petitioner] no longer felt safe at the shelter. He gathered some things and went out to his car. He got his gun and loaded it for protection. He also got his shaving kit and went back into the shelter and to the bathroom to shave. To his surprise, Carney was standing at the sink. Carney turned around and took two steps toward [Petitioner], who was just outside the bathroom door. [Petitioner] drew his gun, pointed it at the ceiling, and said, "Don't fuck with me anymore." Carney calmly approached him and said, "Are you going to shoot me? Go ahead and shoot. I'm not afraid to die. I'm not afraid of you." [Petitioner] said, "I don't want to shoot you" a couple of times. He felt intimidated. He lowered his gun toward Carney, put his finger on the trigger, and took the safety off. Carney then grabbed the gun, pulled it toward his chest, and said that he was not afraid to die. [Petitioner] thought, "[H]e's going to take the gun from me. He could take the gun from me. He could turn it on me and use it on me. That he could just twist it right out of my hands. He had a better grip on it than I did. My hand was shaking. I can't think of what to do. I'm - I'm trying to diffuse [sic] the situation, but I can't - I can't concentrate. It's - I haven't calmed down from a few minutes before when we had the argument. And I'm not thinking clearly. I can't concentrate. My mind is racing."

Carney said, "Well, if you're not going to shoot me, put the gun down." [Petitioner] lowered the gun and started backing out of the bathroom. As he did, Carney said, "You're not the only one with a gun. I got a Beretta nine millimeter in storage." [Petitioner] did not know what "storage" meant and thought, "okay, gunfight at O.K. Corral." Carney said, "I want to get away from assholes like you." Then Carney, who was about five feet away, lunged at [Petitioner] with his arms outstretched and his hands open. [Petitioner] turned to avoid him, raised his gun, took off the safety, and pulled the trigger. Carney never reached [Petitioner]. When [Petitioner] looked back, Carney was on the floor on his back. [Petitioner] could hear Carney breathing. He did not

Order Denying Petition for Writ of Habeas Corpus and Denying Request for Certificate of Appealability
P:\PRO-SE\SJ.JF\HC.08\McKean02450_hcruling.wpd

3

think he needed CPR, so he left and walked back to his car.  He emptied the gun and put it on the hood and put his shaving kit back into the car. Within two hours, [Petitioner] was interviewed by Detective Coffman. FN3.

FN3. The interview was recorded, and a partial transcript of the interview was admitted into evidence.

During the interview, [Petitioner] did not mention that he went to his car for his shaving kit. He did not mention Carney's statement about walking softly and carrying a big stick.  He told Detective Coffman that when he saw Carney in the bathroom, Carney turned and stepped toward him.  However, he did not say that his hand was shaking or that Carney tried to take the gun away from him.  He did not mention that Carney lunged at him or that he turned away just before he shot Carney. Instead, he reported that before Carney said a word to him, he said, "Mr. Carney, don't fuck with me." [Petitioner] further reported that when Carney asked him to lower the gun, he dropped it down by his side. When Carney suggested that they "put on the gloves," [Petitioner] said, "I won't get hurt, you will . . . ." FN4.  He then pointed the gun, removed the safety, and shot Carney in the chest.  Detective Coffman asked, "So what, what was going through your mind to make you pick that gun up again and point it at him and take the safety off?" [Petitioner] answered, "Because I felt that it wasn't over. It, it wasn't going to end.  That I was still going to be found out there.  Sometime. Somewhere." When Detective Coffman asked, "In the future," [Petitioner] said, "Yeah."

FN4. [Petitioner] testified, however, that he only thought this; he did not say it.

At trial, [Petitioner] conceded that he did not tell Detective Coffman that he thought Carney was going to kill him right then and there.  [Petitioner] also admitted to Detective Coffman that he should have just walked away.  He said that if he had had a good attitude, he would not have felt it necessary to defend himself.  [Petitioner] testified that he was in shock during the interview and suffered gaps in his memory.

Doctor James Misset testified as an expert on the effects of traumatic incidents.  He explained that trauma and stress can both distract and concentrate one's focus and undermine one's memory of events.  However, when the trauma and stress pass, memory and recall can, and do, improve.

Doctor Bruce Linenberg, a psychologist, testified that he treated [Petitioner] from August 21 to September 5, 2001, when [Petitioner] was an in-patient at the Veteran's Administration Hospital.  FN5. Doctor Linenberg explained that in-patient psychiatry deals with people who are in acute states of depression and psychosis and not stable enough for a day program.  He diagnosed [Petitioner] with "a combination of dysthymic disorder and personality disorder with what seemed like perhaps avoidant and paranoid traits or features."  He explained that "dysthymic" means that [Petitioner] was depressed more

Order Denying Petition for Writ of Habeas Corpus and Denying Request for Certificate of Appealability
P:\PRO-SE\SJ.JF\HC.08\McKean02450_hcruling.wpd

4

of the time than not. [Petitioner's] diagnosis involved a lack of impulse control, social inhibitions, and hypersensitivity. He opined that one could still be struggling with personality disorders for a few months after being discharged.

FN5. [Petitioner] is an Air Force veteran, and prior to January 2002, he had been homeless for 10 months. At the time of trial, defendant was 49 years old.

## LEGAL CLAIMS

Petitioner asserts the following claims for relief: (1) the trial court violated Petitioner's due process rights by giving improper instructions that "diluted the law of self-defense" and "imperfect self-defense";[2] (2) the trial court violated Petitioner's due process rights by giving improper instructions on the "legal concept of self-defense by an aggressor"; (3) the trial court violated Petitioner's due process rights by giving "erroneous and incomplete instructions on imperfect self-defense"; (4) the prosecutor committed misconduct and violated Petitioner's due process rights by misstating the law of implied malice during closing argument; (5) the prosecutor violated Petitioner's due process rights by failing to disclose evidence which tended to impeach the credibility of a key prosecution witness; and (6) the cumulative effect of all these errors deprived Petitioner of a fair trial.

## DISCUSSION

### A. Standard of Review

This Court will entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2)

---

[2] This claim combines Petitioner's numbered claims 1 and 2.

Order Denying Petition for Writ of Habeas Corpus and Denying Request for Certificate of Appealability
P:\PRO-SE\SJ.JF\HC.08\McKean02450_hcruling.wpd

5

resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 412-413 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411.

"[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" <u>Id.</u> at 409. In examining whether the state court decision was objectively unreasonable, the inquiry may require analysis of the state court's method as well as its result. <u>Nunes v. Mueller</u>, 350 F.3d 1045, 1054 (9th Cir. 2003). The standard for "objectively unreasonable" is not "clear error" because "[t]hese two standards . . . are not the same. The gloss of error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003).

A federal habeas court may grant the writ if it concludes that the state court's adjudication of the claim "results in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The court must presume correct any determination

Order Denying Petition for Writ of Habeas Corpus and Denying Request for Certificate of Appealability
P:\PRO-SE\SJ.JF\HC.08\McKean02450_hcruling.wpd

6

of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

Where, as here, the highest state court to consider Petitioner's claims issued a summary opinion which does not explain the rationale of its decision, federal review under § 2254(d) is of the last state court opinion to reach the merits.  See Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991); Bains v. Cambra, 204 F.3d 964, 970-71, 973-78 (9th Cir. 2000).  In this case, the last state court opinion to address the merits of Petitioner's claims is the opinion of the California Court of Appeal.

**B.    Analysis of Legal Claims**

1.    Self-Defense and Imperfect Self-Defense

Petitioner claims that the trial court diluted the standard jury instructions on self-defense and imperfect self-defense by giving the instruction defining assault immediately after.  Petitioner argues that given together, the instructions told the jury that in order for Petitioner to claim self-defense, the victim must have first committed assault on the Petitioner or committed some act on Petitioner that placed Petitioner in imminent peril.  Further, Petitioner asserts that the assault instruction essentially told the jury that Petitioner had to prove that the victim committed an assault on him.  Finally, Petitioner claims that the trial court erroneously told the jury that if the victim were acting in self-defense against Petitioner, then Petitioner could not be lawfully defending himself.  Respondent contends that Petitioner procedurally defaulted this claim by failing to raise a contemporaneous objection to the challenged instructions at trial.

A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment.  Coleman v. Thompson, 501 U.S. 722, 729-30 (1991).  Petitioner first raised this claim on direct appeal.  The California Court of Appeal stated, in pertinent part:

> Initially, the Attorney General argues that [Petitioner] waived his
> claim by failing to object to below.  Generally, "a party may not

Order Denying Petition for Writ of Habeas Corpus and Denying Request for Certificate of Appealability
P:\PRO-SE\SJ.JF\HC.08\McKean02450_hcruling.wpd

7

complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (People v. Andrews (1989) 49 Cal. 3d 991, 1024; accord, People v. Catlin (2001) 26 Cal. 4th 81, 149.) Here, [Petitioner] does not argue that the standard instructions on self-defense or assault are themselves erroneous. Moreover, none of the court's instructions directly state that for a defendant to claim self-defense, he or she has to prove that the victim actually committed an assault first or put the defendant in actual danger. As noted, [Petitioner] claims that when the self-defense and assault instructions are read together, they erroneous suggested that [Petitioner] had such a burden. However, if [Petitioner] thought the assault instruction rendered the self-defense instructions unclear, misleading, ambiguous, or contradictory, he was not entitled to "remain mute at trial and scream foul on appeal for the court's failure to expand, modify, and refine standardized jury instructions." (People v. Daya (1994) 29 Cal. App. 4th 697, 714.) He had an obligation to object and request clarifying language to eliminate whatever erroneous suggestion he perceived. (People v. Rodrigues (1994) 8 Cal. 4th 1060, 1192; People v. Johnson (1993) 6 Cal. 4th 1, 53.) Nevertheless, we shall exercise our discretion to overlook [Petitioner's] forfeiture and address his claim. (See People v. Johnson (2004) 119 Cal. App. 4th 976, 984-985.)

(Resp. Ex. 6, p. 8-9.)

Under the applicable law, the state court decision must "explicitly invoke[ ] a state procedural bar rule as a separate basis for its decision." McKenna v. McDaniel, 65 F.3d 1483, 1488 (9th Cir. 1995). Federal review will not be precluded "unless the state court makes clear that it is resting its decision denying relief on an independent and adequate state ground." Siripongs v. Calderon, 35 F.3d 1308, 1317 (9th Cir. 1994).

The preceding passage from the state court's opinion contains no express or explicit statement, or any other clear indication, that Petitioner's claim was denied *because* of his failure to request a clarifying or additional instruction. The passage does not state the claim is denied, waived, not cognizable, barred, or will not be considered, nor does it use any other similar language that demonstrates that the state court rejected the claim because Petitioner did not request a clarifying instruction. Rather, the court simply noted that Petitioner had not requested such an instruction and then exercised its discretion to address the claim. Federal review of Claim 1 thus is not precluded by the contemporaneous objection rule because the rule was not relied upon clearly or explicitly by the state court as a basis for its decision denying the claim.

Order Denying Petition for Writ of Habeas Corpus and Denying Request for Certificate of Appealability
P:\PRO-SE\SJ.JF\HC.08\McKean02450_hcruling.wpd

8

Moreover, this Court has the discretion to decide the claim on the merits without determining whether the claim is procedurally defaulted. See Lambrix v. Singletary, 520 U.S. 518, 525 (1997) (a district court may address the merits without reaching procedural issues where the interests of judicial economy are best served by doing so); Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same."). Accordingly, the Court addresses the merits below.

The instructions at issue here include CALJIC Nos. 5.12,[3] justifiable homicide in self-defense; 5.17,[4] actual but unreasonable belief in necessity to defend – manslaughter;

---

[3] "The killing of another person in self-defense is justifiable and not unlawful when the person who does the killing actually and reasonably believes, one, that there is imminent danger that the other person will either kill him or cause him great bodily injury, and, two, that it is necessary under the circumstances for him to use in self-defense force or means that might cause the death of the other person for the purpose of avoiding death or great bodily injury to himself. The fear of death or great bodily injury is not sufficient to justify homicide. To justify taking the life of another in self-defense, the circumstances must be such as would excite the fears of a reasonable person placed in a similar position, and the party killing must act under the influence of those fears alone. Those dangers must be apparent, present, immediate and instantly dealt with, or must so appear at the time to the slayer as a reasonable person, and the killing must be done under a well-founded belief that it is necessary to save one's life – er, excuse me – save oneself from death or great bodily harm." (RT 975.)

[4] "A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully but does not harbor malice aforethought and is not guilty of murder. This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief. Such an actual but unreasonable belief is not a defense to the crime of voluntary manslaughter.

As used in this instruction, an "imminent" peril or danger means one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer. Imminent peril of danger – excuse me – imminent peril or danger must have existed or appear to the [Petitioner] to have existed at the very time the fatal shot was fired. In other words, the peril must appear to the [Petitioner] as immediate and present and not prospective nor in the future. However, this principle is not available and malice aforethought is not negated if the [Petitioner] by his wrongful conduct created the circumstances which legally justified his adversary's use of force, attack, or pursuit." (RT 976.)

Order Denying Petition for Writ of Habeas Corpus and Denying Request for Certificate of Appealability
P:\PRO-SE\SJ.JF\HC.08\McKean02450_hcruling.wpd

9

1   5.30,[5] self-defense against assault; 9.00,[6] assault – defined; and 9.01,[7] assault – present

2   ability to commit injury necessary.

3       When a claim for federal collateral relief is based upon asserted instructional

4   errors, an instruction may not be judged in artificial isolation, but must be considered in

5   the context of the instructions as a whole and the trial record.  See Estelle v. McGuire,

6   502 U.S. 62, 72 (1991).  In other words, the Court must evaluate jury instructions in the

7   context of the overall charge to the jury as a component of the entire trial process.

8   United States v. Frady, 456 U.S. 152, 169 (1982).  The defined category of infractions

9   that violate fundamental fairness is very narrow.  "Beyond the specific guarantees

10  enumerated in the Bill of Rights, the Due Process Clause has limited operation."  Estelle,

11  502 U.S. at 73.

---

[5]  "It is lawful for a person who is being assaulted to defend himself from attack if, as a reasonable person, he has grounds for believing and does believe that bodily injury is about to be inflicted upon him.  In doing so, that person may use all force and means which he believes to be reasonably necessary and which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent"  (RT 976-77.)

[6]  "In order to prove an assault, each of the following elements must be proved:  One, a person willfully and unlawfully committed an act which by its nature would probably and directly result in the application of physical force on another person.  Two, the person committing the act was aware of facts that would lead a reasonable person to realize that as a direct, natural and probable result of this act that physical force would be applied to another person.  And, three, at the time the act was committed, the person committing the act had the present ability to apply physical force to the person of another.

The word "willfully" means that the person committing the act did so intentionally.  However, an assault does not require an intent to cause injury to another person, or an actual awareness of the risk that injury might occur to another person.

To constitute an assault, it is not necessary that any actual injury be inflicted. However, if an injury is inflicted it may be considered in connection with other evidence in determining whether an assault was committed and, if so, the nature of the assault.  A willful application of physical force upon the person of another is not unlawful when done in lawful self-defense."  (RT 977.)

[7]  "A necessary element of an assault is that the person committing the assault have the present ability to apply physical force to the person of another. This means that at the time of the act which by its nature would probably and directly result in the application of physical force upon the person of another, the perpetrator of the act must have the physical means to accomplish that result. If there is this ability, present ability exists even if there is no injury."  (RT 977-78.)

In reviewing ambiguous instructions, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. See id. at 72 & n.4. In order to show a due process violation, the Petitioner must show both ambiguity and a "reasonable likelihood" that the jury applied the instruction in an unconstitutional manner, for example, by relieving the state of its burden of proving every element beyond a reasonable doubt. Waddington v. Sarausad, 129 S. Ct. 823, 831 (2009).

The California Court of Appeal rejected Petitioner's claim, reasoning as follows:

> First, and contrary to [Petitioner's] claim, the self-defense and assault instructions, even when read in isolation from the court's other instructions, do not "clearly and unequivocally" imply that self-defense requires proof that the ultimate victim posed actual danger. As noted, one of the assault instructions (CALJIC No. 5.30) itself explains that a person may defend himself "if, as a reasonable person, he has grounds for believing, and does believe" that he is about to be attacked; and he may use all force "he believes to be reasonably necessary, and which would appear to a reasonable person in the same or similar circumstances to be necessary, to prevent the injury which appears to be imminent." That instruction is facially inconsistent with any possible inference that actual danger is a prerequisite to self-defense.

> However, even if the instructions in isolation could theoretically give the wrong impression about the need for actual danger, we note that the court also gave CALJIC No. 5.51, which expressly instructed the jury that "[a]ctual danger is not necessary to justify self-defense. If one is confronted by the appearance of danger which arouses [in] his mind-excuse me -- arouses in his mind as a reasonable person an actual belief and fear that he is about to suffer bodily injury and if a reasonable person in a like situation seeing and knowing the same facts would be sufficient in believing himself in like danger and if that individual so confronted acts in self-defense upon these appearances and from that fear and actual beliefs, the person's right of self-defense is the same whether the danger is real or merely apparent." That instruction plainly and unequivocally rebuts any potential suggestion that actual danger might be necessary.

> The alleged erroneous suggestion that [Petitioner] had to prove that Carney unlawfully assaulted him first is an even more remote possibility. [Petitioner] teases this suggestion from the following language in the assault instruction: "to prove an assault, each of the following elements must be proved. . . ." (CALJIC No. 9.00.) However, that language does not reasonably indicate that the [Petitioner] bears the burden to prove anything. Moreover, just before the court instructed the jury on assault, it told the jury that "[u]pon a trial of a charge of murder,

Order Denying Petition for Writ of Habeas Corpus and Denying Request for Certificate of Appealability
P:\PRO-SE\SJ.JF\HC.08\McKean02450_hcruling.wpd

11

a killing is lawful if it was justifiable. The burden is on the prosecution to prove beyond a reasonable doubt that the homicide was unlawful and, that is, not justifiable. If you have a reasonable doubt that the homicide was unlawful, you must find the [Petitioner] not guilty." (See CALJIC No. 5.15.)

In determining the impact of the court's instructions and whether there is a reasonable likelihood that the jury misunderstood or misapplied them, we must also consider the arguments of counsel. (People v. Young, (2005) 34 Cal. 4th 1149, 1202.) Here, the prosecutor did not say or imply anything during closing argument to suggest that for [Petitioner] to claim self-defense and justifiable homicide, he had the burden to prove that Carney unlawfully assaulted him first. Nor did defense counsel's argument suggest that [Petitioner] had such a burden or was attempting to satisfy it.

In sum, [Petitioner] strains to conjure an erroneous legal theory from relevant and legally correct standard instructions. However, when all of the pertinent instructions are read together, they do not naturally or reasonably, expressly or implicitly, convey such a theory. We presume that the jurors followed the court's instruction to consider the instructions as a whole and were able to understand and correlate the instructions in reaching a verdict. (See People v. Pinholster, (1992) 1 Cal. 4th 865, 919; People v. Adcox, (1988) 47 Cal.3d 207, 253; People v. Scheer, (1998) 68 Cal. App. 4th 1009, 1023; People v. Scott, (1988) 200 Cal. App. 3d 1090, 1095.) Accordingly, we find no reasonable likelihood that the jury misunderstood the instructions to impose a burden on [Petitioner] to prove actual danger or that the jury misapplied the instructions in that way. In sum, therefore, there was no instructional error concerning the law of self-defense arising from the court's assault instructions.

(Resp. Ex. 6, p. 9-10.)

We also reject [Petitioner's] complaint about language in the assault instruction that "[a] willful application of physical force upon the person of another is not unlawful when done in lawful self-defense." According to [Petitioner], that language suggested to jurors that if in fact Carney was lawfully defending himself against [Petitioner], then [Petitioner] could not lawfully respond to Carney and claim self-defense. [Petitioner] argues that such a concept misstates the applicable law on self-defense, which focuses on what was reasonably apparent from the [Petitioner's] perspective and not what is real or actual.

However, the language in the assault instruction is proper and correct. "It is well established that the ordinary self-defense doctrine-applicable when a defendant reasonably believes that his safety is endangered - may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.]" (In re Christian S., (1994) 7 Cal. 4th 768, 773, fn. 1; see People v. Smith (1973) 33 Cal. App. 3d 51, 68 ["One who assails another and then brings on an attack may not claim self-defense as a ground of exemption from the consequences of killing his adversary"]; People v. Garcia,

1
        (1969) 275 Cal. App. 2d 517, 523 ["A man has not the right to provoke
        a quarrel, go to it armed, take advantage of it and then convert his
2       adversary's lawful efforts to protect himself into grounds for further
        aggression against him under the guise of self-defense"].)
3

(Resp. Ex. 6, p. 13.)
4

        With respect to Petitioner's parallel claim that the assault instruction diluted the
5

imperfect self-defense instruction, the state appellate court stated:
6

7               This claim is more far fetched than [Petitioner's] previous one
                because unlike the instruction on self-defense, which contains the phrase
8               "person being assaulted" and thus has a verbal connection to the assault
                instruction, the instruction on imperfect self-defense does not even
9               include the word "assault." Moreover, the imperfect self-defense
                instruction expressly, repeatedly, and unequivocally states that a person
10              need only believe that he or she is in imminent peril, and imminent peril
                need only appear to exist. Finally, the court instructed the jury that "[t]o
11              establish that the killing is murder and not manslaughter, the burden is
                on the People to prove beyond a reasonable doubt each of the elements
12              of murder and that [the] act which caused the death was not done in the
                heat of passion or upon sudden quarrel or in the actual, even though
13              unreasonable, belief in the necessity to defend against imminent peril to
                life or great bodily injury." (See CALJIC No. 8.50.)
14
(Resp. Ex. 6, p. 14-15.)
15
        Viewing the challenged instructions as a whole, this Court also rejects Petitioner's
16
claim that the trial court diluted the self-defense and imperfect self-defense instructions.
17
Petitioner concedes that the instructions were correct; he argues merely that together they
18
may have suggested an improper interpretation. However, the trial court gave other
19
instructions that clearly stated that actual danger was not necessary to justify self-defense,
20
see CALJIC No. 5.51 (RT 978-79), and that the imminent peril need only to have
21
*appeared* to exist to Petitioner, see CALJIC No. 5.17 (RT 976), 5.30 (RT 976-77). In
22
addition, the trial court instructed the jury that the prosecution had the burden to prove
23
that the homicide was both unlawful and unjustifiable, see CALJIC No. 5.15, negating the
24
idea that the jury could believe that the burden of such proof was on Petitioner. Finally,
25
the trial court's instruction that "a willful application of physical force upon the person of
26
another is not unlawful when done in lawful self-defense" is a proper statement of the
27
law.
28

1   Accordingly, the state court's determination was not contrary to, or an

2   unreasonable application of, clearly established Supreme Court precedent, nor was it

3   based on an unreasonable determination of the facts in light of the evidence presented.  28

4   U.S.C. § 2254(d)(1), (2).

5       2.   <u>Self-Defense by an Aggressor</u>

6       Petitioner claims that although the trial court gave CALJIC No. 5.54,[8] the trial

7   court erred by failing to instruct the jury that "some or all of the requirements that would

8   make self-defense available to an initial aggressor can be excused if the counterattack by

9   the ultimate victim is so sudden and perilous that the initial aggressor cannot withdraw."

10  (Petition at Attachment Number 3.)

11      Due process requires that "'criminal defendants be afforded a meaningful

12  opportunity to present a complete defense.'"  <u>Clark v. Brown</u>, 450 F.3d 898, 904 (9th Cir.

13  2006) (quoting <u>California v. Trombetta</u>, 467 U.S. 479, 485 (1984)).  Therefore, a criminal

14  defendant is entitled to adequate instructions on the defense theory of the case.  <u>See</u>

15  <u>Conde v. Henry</u>, 198 F.3d 734, 739 (9th Cir. 2000).  However, a defendant is entitled to

16  an instruction on his defense theory only "if the theory is legally cognizable and there is

17  evidence upon which the jury could rationally find for the defendant."  <u>United States v.</u>

18  <u>Boulware</u>, 558 F.3d 971, 974 (9th Cir. 2009) (internal quotations omitted).

19      The California Court of Appeal rejected Petitioner's assertion, analyzing state case

20  law which creates an exception to the law of self-defense as asserted by the aggressor.

21  The court concluded that although the trial court's instruction in fact was incomplete, the

22  exception was inapplicable to Petitioner based on the evidence produced at trial.  (Resp.

23  Ex. 6, p. 15-19.)  Accordingly, it concluded that the failure to give an instruction based on

24  the exception was not error.  (<u>Id.</u>)

25      ────────────────
        [8] "The right of self-defense is only available to a person who initiated an assault, if he has
26  done all the following . . . number one, he has actually tried in good faith to refuse to continue
    fighting. Two, he has clearly informed his opponent that he wants to stop fighting. Three . . . he
27  has clearly informed his opponent that he has stopped fighting. After he has done these three
    things, he has the right to self-defense if his opponent continues to fight."  (RT 979.)
28

California law permits a wrongful aggressor to assert a right of self-defense against his victim if the victim's "counter assault [is] so sudden and perilous that no opportunity [is] given to decline or to make known to his adversary his willingness to decline the strife, if he cannot retreat with safety, then, as the greater wrong of the deadly assault is upon his opponent, he would be justified in slaying forthwith in self-defense." People v. Hecker, 109 Cal. 451, 464 (1895).

In essence, Petitioner argues that the failure to instruct the jury about the exception prevented the jury from finding a justifiable homicide if it concluded that even if Petitioner were the initial aggressor, Carney's sudden lunge at Petitioner made it impossible for Petitioner to retreat. However, as the California Court of Appeal observed:

> [Petitioner] misunderstands the Hecker exception. The rule is that an unlawful aggressor must retreat and notify his victim before he can justify any further application of force against the victim as self-defense. This is so regardless of the nature of the initial aggression. The exception applies when the initial aggression involves a simple assault, and the victim suddenly and wrongfully escalates the level of force and violence by responding with excessive - i.e., unreasonable-force, making it impossible for the aggressor to retreat. Under such circumstances, the initial aggressor may respond to such an excessive counterattack with all the force reasonably necessary under the circumstances to prevent the threatened death or great bodily injury.

> Insofar as [Petitioner] claims that the mere suddenness of Carney's counterattack entitled him to defend himself with deadly force, his claim fails. It is not the suddenness of a victim's counterattack that gives an aggressor the right of self-defense; it is the wrongfulness of the victim's counterattack, more specifically, the unreasonable and excessive use of force by the victim. Indeed, as Hecker explains, if an aggressor commits a deadly assault, and the victim suddenly responds with equally deadly force, the aggressor who fails to withdraw does not gain the right to respond in self-defense even if it is impossible to withdraw.

> Insofar as [Petitioner] claims that Carney's counterattack was excessive, unreasonable, and wrongful, his claim also fails. [Petitioner] admitted that during his initial confrontation with Carney, he threatened to shoot and kill him. [Petitioner] admitted that shortly after their confrontation, he armed himself and approached Carney in the bathroom. [Petitioner] further admitted that he took the gun out of his back pocket, pointed it toward the ceiling, said "[d]on't fuck with me anymore," and pointed his gun toward Carney. [Petitioner's] own testimony establishes an assault with a firearm that posed an actual or

Order Denying Petition for Writ of Habeas Corpus and Denying Request for Certificate of Appealability
P:\PRO-SE\SJ.JF\HC.08\McKean02450_hcruling.wpd

15

apparent imminent threat of death or great bodily injury.  Under the circumstances, Carney was entitled to use any and all reasonable force to defend himself and pursue [Petitioner] until he has secured himself from the apparent danger.  (See People v. Scoggins, (1869) 37 Cal. 676, 683; e.g., People v. Williams,(1977) 75 Cal. App. 3d 731, 735, 737, 740; People v. Garcia, supra, 275 Cal. App. 2d 517, 522-523; see also CALJIC No. 5.50.)  Next, it is undisputed that Carney did not counterattack with a deadly weapon or force. [Petitioner] testified that Carney merely lunged at him.  However, [Petitioner] was holding a gun and had actually or apparently threatened him with it.  Thus, even if we accept [Petitioner's] version of events, [Petitioner's] testimony is not sufficient to support a finding that Carney responded to [Petitioner] with excessive and unreasonable force that would have justified [Petitioner's] use of deadly force in response.  In other words, the record does not support a finding that Carney escalated the level of force and violence, let alone, that he wrongfully did so.

(Resp. Ex. 6, p. 17-19.)

Here, based on the evidence produced at trial and Petitioner's own testimony, Petitioner's alleged initial confrontation with Carney was not a simple assault but one in which Petitioner was armed with a gun and pointed the gun at Carney.  Carney's response could not reasonably be viewed as excessive, nor was it even an equal showing of deadly force.  The record thus does not demonstrate that Petitioner was entitled to a Hecker instruction.  See Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005) (stating that a defendant is not entitled to have a jury instruction embodying the defense theory if the evidence does not support it).

Accordingly, the state court's determination was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d)(1), (2).

3.    Incomplete Instructions on Imperfect Self-Defense

Petitioner claims that although the trial court properly gave CALJIC No. 5.17, supra note 4, the standard jury instruction on imperfect self-defense, that instruction was incomplete without also telling the jury that CALJIC Nos. 5.50[9] (the assailed person need

_____

   [9] "A person threatened with attack -- an attack that justifies the exercise of the right of self-defense need not retreat.  In his exercise of his right of self-defense, a person may stand his

not retreat), 5.51[10] (actual danger is not necessary), and 5.54 (regaining of the right to self-defense by the initial aggressor), supra note 8 -- the same concepts applicable to self-defense -- were applicable to imperfect self-defense. Respondent again contends that Petitioner's claim is procedurally barred under the contemporaneous objection rule. However, for the same reasons the Court discussed in Section B.1, supra, the Court will address the merits. See Lambrix, 520 U.S. at 525; Franklin, 290 F.3d at 1232.

The California Court of Appeal rejected Petitioner's claim, concluding that additional instructions were unnecessary. (Resp. Ex. 6, p . 20.) Specifically, regarding CALJIC No. 5.50, the court noted that neither CALJIC No. 5.50 nor the imperfect self-defense instruction require that an assailed must retreat even if he would not be justified in taking action in self-defense. (Resp. Ex. 6, p. 21.) The court also noted Petitioner's failure to explain "what any such modification would have added to the instruction on imperfect self-defense that was material, necessary, but missing; and he fail[ed] to explain how such a modification might disabuse the jury of some popular misconception about imperfect self defense." (Id.)

With respect to CALJIC No. 5.51, the state appellate court concluded that adapting the instruction to imperfect self-defense would have been redundant and unnecessary because the imperfect self-defense instruction already instructs that there need only be an *appearance* of a threat to permit the defense of oneself. (Id. at 21-22.)

Petitioner fails to show how the addition of CALJIC Nos. 5.50 and 5.51 to the

---

ground and defend himself by the use of all force and means which would appear to be necessary to a reasonable person in a similar situation and with similar knowledge. And a person may pursue his assailant until he has secured himself from danger if that course likewise appears reasonably necessary. This law applies even though the assailed person might more easily have gained safety from flight or by running from the scene." (RT 978.)

[10] "Actual danger is not necessary to justify self-defense. If one is confronted by the appearance of danger which arouses his mind -- excuse me -- in his mind, as a reasonable person an actual belief and fear he is about to suffer bodily injury and if a reasonable person in a like situation, seeing and knowing the same facts, would be sufficient in believing himself in like danger and if that individual so confronted acts in self-defense upon these appearances and from that fear and actual belief, that person's right of self-defense is the same whether the danger is real or merely apparent." (RT 978-79.)

imperfect self-defense instruction deprived him of a fair trial. See Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988). The omission of an instruction is less likely to be prejudicial than a misstatement of the law. See Walker v. Endell, 850 F.2d 470, 475-76 (9th Cir. 1987) (citing Henderson v. Kibbe, 431 U.S. at 155). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson v. Kibbe, 431 U.S. 145, 155 (1977)). Here, neither instruction added anything new or material to a theory of imperfect self-defense.

With respect to CALJIC No. 5.54, the California Court of Appeal stated that theoretically, "[t]here could be circumstances under which an initial aggressor may not claim the right of self-defense but may properly claim imperfect self-defense." (Id. at 23.)

> Theory aside, however, the question here is whether such circumstances - e.g., an unlawful assault; an excessive, but not deadly, counterattack; followed by an excessive and deadly response - would, or should, require the court to supplement the instruction on imperfect self-defense with language akin to that in CALJIC No. 5.54 that would explain the circumstances under which an initial, wrongful aggressor gains the right to claim *imperfect* self-defense. We think not.

> As noted, CALJIC No. 5.17, the standard instruction given by the court, bars imperfect self-defense when a defendant's wrongful conduct *legally justifies* the victim's counterattack. This is so even if the defendant harbors an actual belief in the need to defend himself. However, by its own terms, the instruction would not bar imperfect self-defense where the victim's conduct is not legally justified - i.e., imperfect self-defense is available where the victim's response is legally unjustified. Thus, in the complicated scenario outlined above, where the victim responds to the aggressor with excessive and unreasonable force, that counterattack is not legally justified, and the bar against imperfect self-defense is not applicable. Thus, if a defendant actually believed that he that he needed to use deadly force against the victim's legally unjustified counterattack, but the belief was not reasonable, the defendant would be entitled to claim imperfect self-defense. Nothing in CALJIC No. 5.17 suggests otherwise. Consequently, we do not believe that in the absence of a request, a court has a sua sponte duty to adapt CALJIC No. 5.54 to the doctrine of imperfect self-defense or otherwise supplement the imperfect self-defense with language concerning the exception outlined in Hecker.

(Resp. Ex. 6, p. 23-24.) The court concluded that Petitioner's claim assumes that

1  Carney's counterattack was not legally justified -- an assumption that is not supported by

2  the evidence.  (Id. at 24.)

3      As noted previously, a defendant is not entitled to have a jury instruction

4  embodying a defense theory if the evidence does not support it.  Menendez, 422 F.3d at

5  1029.  Based on the evidence produced at trial and Petitioner's own testimony, Carney's

6  response was not excessive, nor was it an equal showing of deadly force.

7  4.    Prosecutorial Misconduct - Misstatement

8      Petitioner next claims that the prosecutor committed misconduct when he argued

9  in closing that if a killing is done by a defendant and nothing else is shown, the law

10 presumes that the killing is malicious, and it is murder.  The record shows that the

11 prosecutor described the differences between first degree and second degree murder and

12 express and implied malice as follows:

13          Deliberation and premeditation is not required for second-degree
           murder.  It's just an intentional killing, essentially, a killing done with
14         malice, a killing done expressly with express malice or implied malice,
           an intentional act.  Deliberation and premeditation are not required for
15         second degree murder.

16          What's an example of second-degree murder?  If A kills B and
           that's all you know, it's second-degree murder.  And the quote here
17         from a California case: "When a killing is proved to have been
           committed by the Defendant and nothing further is shown, the
18         presumption applies that it was malicious and an act of murder."

19 (RT 998.)  Petitioner objected to this phrasing, and objected specifically to the use of the

20 word "presumption."  (RT 1000.)  After hearing argument outside the presence of the

21 jury, the trial court allowed the prosecutor to continue, provided that the prosecutor

22 explain that the quote from the California case was meant to describe an example of

23 implied malice.  (RT 1002.)  When the jury returned, the prosecutor clarified his point.

24          From the chart that you're looking at as an example of a second
           degree implied malice murder.  And the case says, "It is settled that the
25         necessary element of malice may be inferred from the circumstances of
           the homicide."  Implied malice, this is an example.  So if A kills B and
26         that's all you know, that's an implied malice second-degree murder.

27          And the case goes on to say "When the killing is proved to have
           been committed by the Defendant and nothing further is shown, the
28

1
2

presumption applies that it was malicious and an act of murder." In such a case, the verdict should be murder of the second degree and not murder of the first degree, which is why this is an example of a second.

3    (RT 1003.)

4        Prosecutorial misconduct is cognizable in federal habeas corpus. A defendant's

5    due process rights are violated when a prosecutor's misconduct renders a trial

6    "fundamentally unfair." <u>See</u> <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986); <u>Smith v.</u>

7    <u>Phillips</u>, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of

8    alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the

9    prosecutor"). Under <u>Darden</u>, the first issue is whether the prosecutor's remarks were

10   improper; if so, the next question is whether such conduct infected the trial with

11   unfairness. <u>Tan v. Runnels</u>, 413 F.3d 1101, 1112 (9th Cir. 2005). However,

12   "[a]rguments of counsel generally carry less weight with a jury than do instructions from

13   the court." <u>Boyde v. California</u>, 494 U.S. 370, 384 (1990).

14       The California Court of Appeal rejected Petitioner's claim. It stated that while the

15   prosecutor's statement was a correct statement of the law, it was improper as an

16   instruction. (Resp. Ex. 6, p. 25-26.) However, the appellate court determined that the

17   jury instructions given by the trial court removed any doubt that the jury was improperly

18   influenced by that particular statement by the prosecutor. (<u>Id.</u>)

19       Here, even assuming that the challenged statement was improper, Petitioner has

20   not shown that the statement infected the trial with unfairness. The jury is presumed to

21   have followed the trial court's instructions. <u>See</u> <u>Francis v. Franklin</u>, 471 U.S. 307, 324

22   n.9 (1985). These instructions did not use the word "presumption" in the way that the

23   prosecutor did. The trial court properly instructed the jury on express and implied malice,

24   the prosecution's burden of proof, and on self-defense and imperfect self-defense. The

25   court also advised the jury that it was to disregard any argument of counsel that conflicted

26   with the court's instructions.

27   ///

28

Order Denying Petition for Writ of Habeas Corpus and Denying Request for Certificate of Appealability
P:\PRO-SE\SJ.JF\HC.08\McKean02450_hcruling.wpd

20

5.    <u>Prosecutorial Misconduct - Brady violation</u>

Petitioner alleges that the prosecution improperly withheld material evidence that would have impeached the credibility of Doctor Schmunk, the chief medical examiner who testified for the prosecution at trial as an expert in determining the cause and manner of death.

At trial, Doctor Schmunk testified in accordance with the autopsy report that Carney was found lying on his back, that the bullet severed Carney's spinal cord, and that a severed spinal cord causes paralysis.  In Doctor Schmunk's expert opinion, Carney was either standing still or moving backward when he was shot at close range.  Doctor Schmunk testified that Carney could not have been moving forward.

After Doctor Schmunk's testimony but before the conclusion of trial, a local newspaper printed an article reporting that Doctor Schmunk had an outstanding arrest warrant and criminal complaint from Wisconsin charging him with theft, alleging that he had stolen over $400 worth of medical textbooks from his former employer, Brown County.  After conducting a hearing, the trial court permitted defense counsel to re-call Doctor Schmunk to impeach him.

Doctor Schmunk testified that he found out about the criminal complaint in 2002, corresponded with the district attorney as well as other Wisconsin officials, and had considered the matter resolved.  Doctor Schmunk testified that he eventually sent $400 to local Wisconsin officials in full satisfaction of the claim.

After the jury returned a guilty verdict against Petitioner, Petitioner filed a motion for new trial based on the prosecutor's failure to disclose other impeachment material.  Specifically, Petitioner discovered that in 1994, Doctor Schmunk and a co-worker in Sacramento County engaged in a dispute that resulted in the co-worker filing a lawsuit against Doctor Schmunk, which settled in June 1995.  Then, in December 1999, Doctor Schmunk applied to carry a concealed weapon and falsely declared under penalty of perjury that he had not been a party to a lawsuit in the previous five years.  Petitioner also

discovered a confidential memorandum from the Santa Clara District Attorney's office, dated August 2003, that indicated that Special Assistant District Attorney Bill Larsen had received three newspaper articles in April 1999 regarding the dispute between Doctor Schmunk and his former employer in Wisconsin, which included additional details not discussed during trial.

In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Id.</u> at 87. The Supreme Court has since made clear that the duty to disclose such evidence applies even when there has been no request by the accused, <u>United States v. Agurs</u>, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 682.

"There are three components of a true <u>Brady</u> violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999). "[T]here is never a real '<u>Brady</u> violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." <u>Id.</u> at 281.

Here, the California Court of Appeal rejected Petitioner's claim, reasoning that the information was immaterial:

> The impeachment value of the evidence arose from its tendency to show moral turpitude because evidence of moral turpitude can shake confidence in a witness's honesty and integrity and thereby undermine his credibility. (<u>See</u> <u>People v. Castro</u> (1985) 38 Cal.3d 301, 314-315.)

Order Denying Petition for Writ of Habeas Corpus and Denying Request for Certificate of Appealability
P:\PRO-SE\SJ.JF\HC.08\McKean02450_hcruling.wpd

22

On the other hand, the subject matter of the impeachment evidence involved collateral matters. None of it had any direct connection to the facts of this case, Doctor Schmunk's professional qualifications and expertise as a medical examiner, the validity of the autopsy performed by Doctor Gleckman, or the soundness of Doctor Schmunk's analysis and opinion concerning Carney's position at the time he was shot. As to those material and critical matters, [Petitioner] was fully able to cross-examine Doctor Schmunk. [Petitioner] was also free to call his own forensic expert to contradict Doctor Schmunk and present a different theory consistent with [Petitioner's] testimony that Carney lunged at him just before the fatal shot.

We further note that Doctor Schmunk's opinion was based on undisputed evidence: (1) Carney was found lying on his back; (2) the bullet severed his spinal cord; and (3) a severed spinal cord causes instant paralysis. On the other hand, [Petitioner's] claim that Carney lunged at him was undermined by the fact that before trial, he never claimed or told anyone that Carney had lunged at him, even though that factual assertion was essential to his claim of perfect and imperfect self-defense.

Last, we note that at trial, [Petitioner] was able to impeach Doctor Schmunk with information about the criminal complaint and allegations that he stole over $400 worth of textbooks. Generally, "impeachment evidence has been found to be material where the witness at issue 'supplied the only evidence linking the defendant(s) to the crime,' [citations], or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case [citation].'" (U.S. v. Payne (2d Cir. 1995) 63 F.3d 1200, 1210.) But "where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." (U.S. v. Avellino (2d Cir. 1998) 136 F.3d 249, 257; Tankleff v. Senkowski (2d Cir. 1998) 135 F.3d 235, 251; see also Clay v. Bowersox (8th Cir. 2004) 367 F.3d 993, 1000; Simental v. Matrisciano (7th Cir. 2004) 363 F.3d 607, 614.)

Under the circumstances, [Petitioner] cannot demonstrate, and we do not find, a reasonable probability that the jury would have returned a more favorable verdict - or been hopelessly deadlocked - had defense counsel been able to cross-examine Doctor Schmunk about his coworker's previous lawsuit and Doctor Schmunk's statement on his application for a gun license. (See People v. Salazar, supra, 35 Cal.4th at p. 1052 [failure to disclose evidence to impeach credibility of county medical examiner not Brady violation because evidence not material].) Thus, we find no Brady violation.

(Resp. Ex. 6, p. 31-32.)

Petitioner argued that he should have been able to present Doctor Schmunk's prior

conduct, which amounted to a crime of moral turpitude, to impeach Doctor Schmunk's

testimony.  See People v. Wheeler, 4 Cal. 4th 284, 288-95 (1992) (permitting admission of misdemeanor conduct that is relevant to impeachment).  Doctor Schmunk's testimony was important to Petitioner's defense because it contradicted Petitioner's claim that Carney had lunged at him.

Evidence impeaching the testimony of a government witness falls within the Brady rule.  See Barker v. Fleming, 423 F.3d 1085, 1095 (9th Cir. 2005).  However, here, the information contained in the three 1999 articles related to the criminal complaint for misdemeanor theft that was filed against Doctor Schmunk in Wisconsin, and about which the jury had heard testimony when defense counsel re-called Doctor Schmunk to the stand.  See, e.g., id. at 1096 (affirming the district court's finding that four withheld convictions that could undermine the credibility of a key prosecution witness did not violate Brady because the convictions were immaterial and duplicative of the evidence already presented to the jury).

Further, the evidence regarding Doctor Schmunk's 1999 application to possess a concealed weapon was immaterial to Petitioner's guilt or innocence.  See United States v. Collins, 551 F.3d 914, 924 (9th Cir. 2009).  While Doctor Schmunk's conduct could amount to a misdemeanor crime of moral turpitude, that information appears to be both cumulative to the theft charge and collateral to the issue of Petitioner's guilt or innocence.  See Schad v. Ryan, 2010 WL 92758, *6-7 (9th Cir. 2010) (per curiam) ("We are less likely to find the withholding of impeachment material prejudicial in cases in which the undisclosed materials would not have provided the defense with a new and different form of impeachment.").  Moreover, Petitioner fails to demonstrate that the prosecution suppressed the information regarding the application for a concealed weapon.  See United States v. Price, 566 F.3d 900, 909 (9th Cir. 2009) (""[i]n order to comply with Brady, . . . 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in th[e] case, including the police.'") (quoting Strickler, 527 U.S. at 281).

1    Finally, evaluating the cumulative effect of the allegedly withheld impeachment

2    material, see Kyles, 515 U.S. at 436, this Court concludes that in light of the strength of

3    the prosecution's case, the material was not so critical as to undermine confidence in the

4    outcome of Petitioner's trial.  It was undisputed that Petitioner shot Carney and that

5    Carney was found lying on his back with a severed spinal cord.  Petitioner never told

6    anyone prior to trial that Carney lunged at him.  In fact, immediately after the shooting,

7    Petitioner stated consistently to the police that he shot Carney because he believed that

8    Carney would come back at him "sometime," "somewhere," and "in the future."

9    6.    Cumulative Error

10        Petitioner claims that the cumulative effect of the instructional errors and

11   prosecutorial misconduct warrants habeas relief.  In some cases, although no single trial

12   error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors

13   may still prejudice a defendant so much that his conviction must be overturned.  See

14   Alcala v. Woodford, 334 F.3d 862, 893-95 (9th Cir. 2003).  However, where no single

15   constitutional error is present, as here, nothing can accumulate to the level of a

16   constitutional violation.  See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002).

17        Further, the Supreme Court has long recognized that, "given the myriad safeguards

18   provided to assure a fair trial, and taking into account the reality of the human fallibility

19   of the participants, there can be no such thing as an error-free, perfect trial, and that the

20   Constitution does not guarantee such a trial."  United States v. Hasting, 461 U.S. 499,

21   508-509 (1983).  The AEDPA mandates that habeas relief may only be granted if the state

22   courts have acted contrary to or have unreasonably applied federal law as determined by

23   the United States Supreme Court.  Williams v. Taylor, 529 U.S. 362, 412 (2000).  In the

24   absence of Supreme Court precedent recognizing a claim of "cumulative error," therefore,

25   habeas relief cannot be granted.

26   **C.    Certificate of Appealability**

27        The federal rules governing habeas cases brought by state prisoners recently have

28

Order Denying Petition for Writ of Habeas Corpus and Denying Request for Certificate of Appealability
P:\PRO-SE\SJ.JF\HC.08\McKean02450_hcruling.wpd

25

been amended to require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling.  See Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).  In light of the foregoing discussion, the Court concludes that Petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right [or] that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Accordingly, the Court declines to issue a COA.

## CONCLUSION

The Court concludes that Petitioner has failed to show any violation of his federal constitutional rights in the underlying state criminal proceedings.  Accordingly, the petition for writ of habeas corpus and COA are DENIED.

The Clerk shall terminate all pending motions, enter judgment and close the file.

IT IS SO ORDERED.

DATED: _2/22/10_____

_____
JEREMY FOGEL
United States District Judge

Order Denying Petition for Writ of Habeas Corpus and Denying Request for Certificate of Appealability
P:\PRO-SE\SJ.JF\HC.08\McKean02450_hcruling.wpd

26

# UNITED STATES DISTRICT COURT

## FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

RONALD PAUL MCKEAN,

          Petitioner,

  v.

JAMES A. YATES, Warden,

          Respondent.
_____/

Case Number: CV 08-02450 JF

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on __3/3/10_____, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.


Ronald Paul McKean V-22458
Correctional Traning Facility at Soledad
PO Box 705
North-A; Rainier A 232 up
Soledad, CA 93960-0705

Dated: __3/3/10_____

                                    Richard W. Wieking, Clerk
                                    By: Diana Munz, Deputy Clerk

Ronald Paul McKean V-22458
Correctional Traning Facility at Soledad
PO Box 705
North-A; Rainier A 232 up
Soledad, CA 93960-0705


CV08-02450 JF